NAZARETH REGIONAL HIGH SCHOOL, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 121, Docket 76–4076.

United States Court of Appeals, Second Circuit.

Argued Nov. 29, 1976.

Decided Feb. 28, 1977.

**4.** The parties' have represented to this court that they may be close to settling this issue.

Kevin J. McGill, New York City (Clifton, Budd, Burke & DeMaria, New York City, on the brief), for petitioner.

John C. Rother, N.L.R.B., Washington, D.C. (John S. Irving, Jr., Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and John D. Burgoyne, Asst. Gen. Counsel, National Labor Relations Board, Washington, D.C., on the brief), for respondent.

Before MOORE, ANDERSON and FEINBERG, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

Nazareth Regional High School (Nazareth) brings this petition to review and set aside an order issued on February 24, 1976, by the National Labor Relations Board (NLRB) which held that Nazareth committed several unfair labor practices. The NLRB has cross-petitioned for enforcement of its order finding Nazareth in violation of §§ 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) and (5).[1] A cease and desist order was issued forbidding these practices. Nazareth was also required: (1) to recognize and bargain with the Lay Faculty Association, Local 1261, American Federation of Teachers, AFL–CIO (Local 1261 or Union); (2) to grant employees restitution of any wages and benefits that may have been lost because of unilateral imposition of contract terms; (3) to reinstate, with back pay, James Mirrione, a teacher found to have been refused reemployment in violation of § 8(a)(3); and (4) to post certain notices. Basic to the NLRB's holding was its finding that Nazareth was a successor to the Henry M. Hald High School Association (Hald) and the Diocese of Brooklyn with a duty to bargain with Local 1261 when Nazareth assumed operation of the school in September, 1974.

In December, 1973, Nazareth Diocesan announced that Hald, which had been managing Nazareth and eight other schools for the diocese, would discontinue operating Nazareth as of August 31, 1974, and that the school would be taken over by an independent local community group. Local 1261 had a collective bargaining agreement, which expired on August 31, 1974, with Hald covering all full-time lay faculty in the nine diocesan schools. The Union sought information from Hald and the dio-

1. Section 8(a) provides in pertinent part:
 (a) It shall be an unfair labor practice for an employer—
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 * * * * * *
 (3) by discrimination in regard to hire or tenure of employment or any term or condi-
 tion of employment to encourage or discourage membership in any labor organization
 . . . . .
 * * * * * *
 (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

cese concerning what effect, if any, the transfer of Nazareth to a neighborhood group would have on the lay faculty, but all requests were either ignored or refused.

Early in 1974, the board of trustees which was to assume control of Nazareth for the school year commencing September 1, 1974, was formed. Local 1261 thereafter focused its attempts to gain recognition and to participate in the transition upon the chairman of this new board of trustees, Thomas Keenan, and Nazareth's principal, Brother Mathew Burke. Robert Gordon, president of Local 1261, wrote Keenan on March 17, 1974, requesting information about the changes at Nazareth but when he received no reply, he telephoned Keenan on March 25, 1974 and demanded a meeting with him and recognition of Local 1261 as the lay faculty's bargaining representative. In the hearings held on the charges in this case, Gordon testified that Keenan told him not to worry because the board of trustees intended to rehire all the lay faculty. Although contradicted by Keenan, Gordon's testimony was credited by both the Administrative Law Judge and the NLRB.

In April, 1974, Keenan mailed letters to most of the lay teachers at Nazareth inquiring whether they wished to teach at the school during the next year under the new administration. He enclosed with this letter a standard employment agreement stating the terms and conditions of employment at Nazareth for the coming year. The Union, on June 20, 1974, once again demanded recognition on the basis of its belief that a majority of the lay faculty had been retained. During the summer the final teacher selections were made by the principal, and, in August, copies of the employment agreement were mailed to them for their signatures. Nazareth began operations on September 1, 1974. Of the 55 lay teachers at Nazareth, 49 had been employed during the previous year at Nazareth Diocesan which had had a lay faculty of 66.

James Mirrione was one of the teachers at Nazareth Diocesan who was not hired by Nazareth. Mirrione taught religion at the school from 1972 to 1974 and had actively participated in a strike there in September, 1973. During the strike, several teachers crossed the picket line and Mirrione, apparently, was quite outspoken in his criticism of them. In November, 1973, he was elected to be an alternate delegate to the Union. In the spring of 1973, he refused to participate in a fund-raising drive for the school because of its failure to cooperate with the Union regarding the reorganization. The principal criticized Mirrione for taking this view. Mirrione had never received a copy of the letter sent out by Keenan concerning reemployment. When later notified of the new administration's refusal to retain him for the 1974–75 school year, Mirrione was told simply that the board of trustees had decided not to offer him a position. A letter, dated June 13, 1974, from Keenan to Mirrione confirmed the board's decision. During October, 1974, Mirrione heard that two positions were open and unfilled in the school's theology department and he filed an application for employment in that department. The principal informed him that there were no jobs available.

When Local 1261 could get no cooperation from the school officials in its drive for recognition, it appealed to the parents and protested the administration's treatment of the Union's demands. In response to this appeal to parents, a letter was drafted by the chairman of the social studies department, Peter Holmes, and the coordinator of the music department, James Serpico, during the spring of 1974 criticizing Local 1261. This letter was circulated among the faculty and, after 40 signatures were obtained, it was mailed to the parents. The Union continued to demand recognition and in the fall of 1974 Holmes filed a decertification petition which was supported by a letter signed by 32 lay faculty members requesting decertification and the opportunity to establish a new, independent union to represent their interests. This letter was also circulated by Holmes and other individuals at the department chairman or coordinator level.

An additional event at the beginning of the 1974–75 school year, alleged to consti-

tute anti-union activity by Nazareth, was the principal's speech at a faculty mass. In referring to the disruptive effects of the 1973 strike, he stated that such activities "would be dealt with swiftly and severely."

Local 1261 first filed charges against Hald, the diocese and Nazareth on May 28, 1974. The charges asserted that these parties were interfering with their employees' rights by refusing to recognize and bargain with Local 1261, by unilaterally altering the conditions and terms of employment through individual negotiation, and by discharging all members of the unit to defeat the local. On December 23, 1974, the Union filed further charges against the same parties alleging unfair labor practices in the refusal to retain Mirrione and continuing coercion and interference with employees' § 7 rights. The charges were consolidated on March 21, 1975 and, upon the issuance of a complaint by the Board's General Counsel a hearing date was set. The complaint charged Hald and the diocese with committing unfair labor practices under §§ 8(a)(1) and (5)[2] of the Act. Nazareth was claimed to have violated §§ 8(a)(1), (3) and (5).

After four days of hearings, the Administrative Law Judge (ALJ) recommended the dismissal of the § 8(a)(3) and (5) claims against Nazareth but found that it had violated § 8(a)(1) through its principal by threatening to deal severely with future strike activity. The ALJ found that, while Nazareth was the successor to Hald and the diocese, the evidence was insufficient to support the other claims of anti-union activity in violation of § 8(a)(1), and that there was no duty to bargain with the incumbent union, because the presumption of continued majority status had been rebutted. On the § 8(a)(3) claim, the ALJ determined that the evidence was insufficient to support the conclusion that an anti-union motivation underlay the refusal to hire Mir-

rione. The General Counsel took exceptions to these rulings.

The NLRB announced its decision on February 24, 1976, in which it adopted the ALJ's finding of successorship by Nazareth, but found that the evidence was insufficient to rebut the presumption of continued majority status by the Union and that Nazareth had not entertained a good faith doubt on this point. It further found that on September 1, 1974, when Nazareth began to operate the school and had hired a majority of its predecessor's employees in the unit, Nazareth had a duty to bargain with the Union. The NLRB further found that under *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 294–95, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), Nazareth was bound to bargain with the Union over the initial terms and conditions of employment because it was "perfectly clear" as of March 25, 1974, that the new administration planned to retain all of the predecessor's employees in the unit. The NLRB concluded, therefore, that Nazareth violated §§ 8(a)(1) and (5) by refusing to recognize the Union and by unilaterally established the initial terms of employment.

The NLRB also disagreed with the ALJ by holding that Nazareth had violated § 8(a)(3) by not hiring Mirrione. After noting Mirrione's union activities, the anti-union background against which the refusal to hire should be viewed, and the failure to give Mirrione adequate reasons for the school's decision, the NLRB found that "the nonrenewal of Mirrione was motivated in substantial part by his union activities in violation of Section 8(a)(3)." In reviewing the alleged § 8(a)(1) violations, the NLRB determined that the principal's speech, the anti-union letters and the decertification petition all violated § 8(a)(1). Supervisory involvement in circulating the anti-union letter and the decertification petition were

**2.** The NLRB found that Hald had violated the Act but no remedy was ordered because the NLRB considered the Union's requested information had become outdated and the bargaining order imposed upon Nazareth as successor was an appropriate remedy for Hald's violation.

The NLRB apparently adopted the recommendation of the Administrative Law Judge that the allegations that the Diocese had violated § 8(a)(5) be dismissed.

deemed to be inherently coercive. The inclusion of supervisors involved in the anti-union activity in the bargaining unit was found to be an insufficient reason to conclude that the activity was noncoercive.

During the hearings on this complaint, all parties stipulated that the lay faculty employed as coordinators or as department chairmen were statutory supervisors within the meaning of § 2(11) of the Act, 29 U.S.C. § 152(11). Consequently, although the unit with which Nazareth's predecessors had been bargaining, included some lay teachers who served in a supervisory capacity, the NLRB confined its bargaining order to all full-time, non-supervisory, lay faculty.[3]

We shall take up the several determinations made by the NLRB and discuss them seriatim.

*§§ 8(a)(1) and (5) Violations—Refusal to Bargain*

■ The key factor in determining whether an employer succeeds to an obligation to bargain with the incumbent union is the substantial continuity in the identity of the work force. *See, Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel & Restaurant Employees*, 417 U.S. 249, 262–65, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns International Security Services, Inc., supra*, 406 U.S. at 280–81, 92 S.Ct. 1571 (1972); *Zim's Foodliner, Inc. v. NLRB*, 495 F.2d 1131, 1140 (7th Cir.), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974). Forty-nine of the sixty-six lay faculty employed by Hald were retained by Nazareth when it began operations on September 1, 1974. This group of forty-nine constituted the majority of Nazareth's lay faculty which was made up of 55 members, who thereby established the requisite continuity of identity in the work force. Nazareth, therefore, succeeded to Hald's duty to bargain with the Union unless there were facts justifying a refusal to bargain. *See, NLRB v. Band-Age, Inc.*, 534 F.2d 1, 4 (1st Cir. 1976), *cert. denied*, 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976).

■ The incumbent union which has been certified by the NLRB is entitled to a rebuttable presumption of continued majority status after the first year as the certified representative of the unit. *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 489 (2d Cir. 1975); *Orion Corp. v. NLRB*, 515 F.2d 81, 85 (7th Cir. 1975); *Celanese Corp. of America*, 95 N.L.R.B. 664, 672 (1951). Given Nazareth's status as successor to Hald which was a party to a collective bargaining agreement with Local 1261 that expired on the eve of petitioner's commencing operation of the school, Nazareth was bound to bargain with the Union unless the presumption of continued majority was rebutted or the new administration entertained a good faith doubt concerning the Union's majority.

Prior to Nazareth's establishment as a community run school, the bargaining unit represented by the Union in negotiations with Hald included all full-time, lay faculty in the nine diocesan schools operated by Hald with the exception of teachers at the rank of assistant principal or above. When the school separated from the Hald group, the bargaining unit was reduced to the lay faculty at Nazareth. The unit has been further diminished by the stipulation made during these proceedings that chairmen and coordinators are supervisors and thus not appropriately included in the unit. These factors led the ALJ to conclude that the presumption of continued majority had been rebutted. We agree with the NLRB's determination, however, that diminution in unit size is insufficient to rebut the presumption of continued majority status.

---

3. Nazareth contends that the unit is inappropriate because it improperly excludes the religious faculty. Although subject to the same conditions of employment and holding positions of equal responsibility, the members of the religious faculty are paid substantially less than the lay faculty. The NLRB has wide discretion in determining the appropriate bargaining unit, *Wheeler-Van Lable Co. v. NLRB*, 408 F.2d 613, 616–17 (2d Cir.), *cert. denied*, 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969), and the exclusion of a group of employees because of substantial variance in pay scale was a proper exercise of discretion. The unit of non-supervisory, full-time, lay faculty is appropriate.

NLRB v. Band-Age, Inc., supra, 534 F.2d at 4–5; Zim's Foodliner, Inc. v. NLRB, supra, 495 F.2d at 1141. As the court pointed out in Band-Age, Inc., such diminution in unit size would not affect the operation of the presumption in a non-successor situation, see, NLRB v. Armato, 199 F.2d 800, 803 (7th Cir. 1952), and there is no reason why the presumption should be applied differently when the reduction in unit size occurs as a result of a change in ownership. 534 F.2d at 4. The April, 1974 Union dues check-off list showed that as of that date a majority of the non-supervisory lay faculty eventually employed by Nazareth were paying dues to the Union.

 To establish a good faith doubt of continued majority status, the employer must produce "clear and convincing evidence of loss of union support capable of raising a reasonable doubt of the union's continuing majority." Retired Persons Pharmacy v. NLRB, supra, 519 F.2d at 489–90. Nazareth has not met that standard. The school claims that its good faith doubt is supported by the substantial number of teachers who crossed the picket line during the 1973 strike, the vote by union members in April, 1974, not to strike which was in opposition to the union leadership's recommendation, the June 3, 1974, letter criticizing the Union which was signed by 49 lay faculty, a substantial number of resignations from the Union, and the October, 1974, decertification petition. As the NLRB pointed out, however, Nazareth never openly questioned the Union's continued majority until the commencement of these proceedings. Additionally, evidence of dissatisfaction with a particular strike or a policy of the union does not establish that the unit no longer wishes to be represented by the union in collective bargaining. Retired Persons Pharmacy v. NLRB, supra, 519 F.2d at 490; Retail, Wholesale & De-

partment Store Union v. NLRB, 151 U.S. App.D.C. 209, 466 F.2d 380, 394 (1973). The decertification petition and many of the resignations from the union came after the refusal to bargain and thus cannot support Nazareth's claim of good faith doubt which has to be evaluated as of the time of the rejection of the Union's recognition demand. NLRB v. Gulfmont Hotel Co., 362 F.2d 588, 589 (5th Cir. 1966). Because petitioner has failed to satisfy the standard of proof required to justify a refusal to bargain, the NLRB's finding that Nazareth did not entertain a good faith doubt as to the Union's majority is sustained.

 Petitioner contends that its refusal to recognize the Union was justified because Local 1261 claimed to represent a bargaining unit that included supervisors. Admittedly, this was an inappropriate demand and an order requiring bargaining with such a unit would not be enforced. NLRB v. Metropolitan Life Insurance Co., 405 F.2d 1169 (2d Cir. 1968). Nazareth, however, never informed the Union that its refusal to bargain was based upon its belief that the unit was inappropriate and the NLRB's order has remedied the defective demand by eliminating supervisors from the unit. Under these circumstances the bargaining order should not be denied enforcement.[4]

### Duty to Bargain Over the Initial Terms and Conditions of Employment

 Normally, a successor employer may unilaterally fix the initial terms and conditions of employment because there is no duty to bargain with a union until the new employer's complement of employees in the bargaining unit actually contains a majority of persons formerly employed by the predecessor. NLRB v. Burns International Security Services, Inc., supra, 406

---

4. Petitioner also claims that the bargaining order is invalid because the Union is "supervisor dominated." Although there is some evidence that supervisors were active in the Union in the past, there is no indication that this placed the Union under the employer's domination. We, therefore, reject this defense to the bargaining order. See, St. Rose de Lima Hospital, Inc., 223 N.L.R.B. No. 224 (May 25, 1976); Carle Clinic Association, 192 N.L.R.B. 512, 513A (1972); International Paper Co., 172 N.L.R.B. 933 (1968).

U.S. at 294–95, 92 S.Ct. 1571. In *Burns* the Supreme Court recognized in dicta, however, that when the successor makes it "perfectly clear" that it intends to retain all of the employees in the unit, the new employer may be required to bargain with the union over the initial terms of employment. The NLRB found that it was perfectly clear as of March 25, 1974, that the newly formed Nazareth Regional High School intended to retain all of Hald's lay faculty because on that date Keenan told the Union not to worry, as all the employees would be retained. The NLRB found independent violations of §§ 8(a)(1) and (5) solely on the basis of this statement. Under the NLRB's own interpretation of the words "perfectly clear," however, its conclusion in this instance must be set aside.

In *Spruce Up Corp.*, 209 N.L.R.B. 194 (1974), the NLRB ruled that when the successor employer promised to retain all of the predecessor's employees and then mailed letters to the employees offering different terms of employment, it was *not* perfectly clear that the successor intended to retain all of the employees because the offers indicated that only those accepting the new terms would be given employment. *Id.* at 195. The NLRB rejected the contrary conclusion as undesirable:

> "For an employer desirous of availing himself of the *Burns* right to set initial terms of employment would, under any contrary interpretation, have to refrain from commenting favorably at all upon employment prospects of old employees for fear he would thereby forfeit his right to unilaterally set initial terms, a right to which the Supreme Court attached great importance in *Burns.*" *Id.*

The NLRB has consistently followed this interpretation. *See, Henry M. Hald High School Ass'n, The Sisters of St. Joseph,* 213 N.L.R.B. No. 54 (Sept. 26, 1974); *Arden's,* 211 N.L.R.B. 501 (1974); *Jerry's Fine Foods,* 210 N.L.R.B. 52, 53 (1974). In *Brotherhood of Railway Clerks, etc. v. REA Express, Inc.,* 523 F.2d 164 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46

L.Ed.2d 388 (1975), we approved the position taken in *Spruce Up* by stating:

> "We read the suggested exception as being limited to those situations where employees are led at the outset by the successor-employer to believe that they will have continuity of employment on pre-existing terms and as not applying where the new employer dispels any such impression prior to or simultaneously with its offer to employ the predecessor's work force." *Id.* at 171.

In this case, although petitioner indicated at an early date an intention to retain the whole staff, it never committed itself to offering the same terms of employment. On the contrary, Nazareth mailed letters to most of the lay faculty early in April inquiring whether they wished to teach at Nazareth and informing them that such employment would be on new terms. Some lay faculty never received this letter because Nazareth had no intention of retaining them. The NLRB suggests that failure to indicate in the March 25, 1974 statement of intent to rehire all employees that there would be new terms distinguishes *Spruce Up* and mandates a finding of a duty to bargain at that point. Although in *Spruce Up* the successor-employer told the union that retention would be on new terms at the same time that it promised to rehire the entire unit, the case is not properly confined to that narrow factual situation. The important consideration in determining whether it is perfectly clear that a successor intends to retain all of the employees is whether they have all been promised re-employment on the existing terms. Because Nazareth never at any time led the lay faculty to believe that they would be retained at the existing terms, it was free to fix the initial terms of employment and was not under a duty to bargain with Local 1261 until September 1, 1974 when it became clear that a majority of Nazareth's lay faculty had been employed at the school by Hald during the previous year. A successor-employer's right to set the initial terms of employment may not be

rendered nugatory solely on the basis of an expression of intention to rehire its predecessor's employees—particularly when the successor's other actions are completely inconsistent with such a statement.

██ Although this conclusion does not affect the NLRB's bargaining order, it does mandate a denial of enforcement of that part of Clause 2(c) of the NLRB's order which compels Nazareth to make restitution for any wages and benefits that may have been lost as a result of its unilateral imposition of terms and conditions of employment. The order.is, therefore, hereby modified to compel restitution only as to wages and benefits that may have been lost by virtue of Nazareth's refusal to bargain with Local 1261 after September 1, 1974.

*Failure to Hire Mirrione*

██ In determining that Nazareth violated § 8(a)(3) by refusing to hire Mirrione as a religion teacher, the NLRB found that an anti-union motivation was a substantial factor in Nazareth's decision. Nazareth, however, attempted to establish that Mirrione was not offered a position because of his immature behavior and his failure to conform to Catholic doctrine in teaching his religion course. Because the § 8(a)(3) claim is time-barred under § 10(b) of the Act, 29 U.S.C. § 160(b), we need not decide whether the NLRB's finding of an anti-union motivation is supported by substantial evidence on the record as a whole.

.Section 10(b) provides that the NLRB cannot issue a complaint based upon an unfair labor practice unless charges are filed with the Board within six months of the action complained of. Local 1261 filed two separate charges in this case. The first was filed on May 28, 1974 and the second on December 24, 1974. Both charges claimed that Nazareth was interfering with the lay teachers' § 7 rights but only the December 24 charge specifically alleged that the refusal to retain Mirrione violated the Act.

The NLRB argues that the complaint was filed in time because the failure to retain

Mirrione did not occur until September 1, 1974 and was, therefore, within six months of the December 24 charges. The NLRB dismissed Nazareth's § 10(b) defense on this basis. Mirrione, however, was formally informed on June 13 that he would not be hired. At that time, or shortly thereafter, the 1973–74 school year had ended and summer vacation had begun. The issue is whether Mirrione could have filed an unfair labor practice charge at any time after the final rejection of his application for re-employment. *See, Local 1104, Communications Workers of America v. NLRB*, 520 F.2d 411, 416 (2d Cir. 1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 778, 46 L.Ed.2d 639 (1976). The action taken by Nazareth on June 13 was not tentative but a final decision not to hire Mirrione for the coming school year and any alleged unfair labor practice under § 8(a)(3) would have to be filed with the NLRB within six months of that event. No reason appears why Mirrone could not have done so.

██ The NLRB seeks to avoid the limitations of § 10(b) on two other grounds: (1) the May, 1974, charges encompassed the subsequent unfair labor practice; and (2) the October refusal to hire Mirrione constituted a separate unfair labor practice. The NLRB's position cannot be sustained on either ground. Section 10(b) does not preclude the NLRB from issuing a complaint on an unfair labor practice that occurs after the charges are filed, *NLRB v. Fant Milling Co.*, 360 U.S. 301, 308–09, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959), but the subsequent conduct alleged to be an independent unfair labor practice must be closely related to the violation alleged in the charges. *Id.* at 305–09, 79 S.Ct. 1179; *NLRB v. Jack LaLanne Management Corp.*, 2 Cir., 539 F.2d 292, 294–95. The charges filed in May alleged, *inter alia*, that Nazareth was committing an unfair labor practice by discharging the entire unit for the purpose of dissipating the Union's majority status. The complaint asserts that a single employee was not retained because of his union activities. The essence of the May charge was that the

employer was attempting a wholesale removal of the Union. On these facts, that charge is not sufficiently closely related to the claimed violation of § 8(a)(3) in the refusal to re-employ only one member of that unit, and, therefore, the May charges do not encompass the June violation. *Cf., Regal China Corp.,* 195 N.L.R.B. 585, 590 (1972), *enf'd,* 83 L.R.R.M. 2940 (7th Cir. 1973).

Regarding the NLRB's assertion that the October refusal to rehire is an independent unfair labor practice within the six months period, it suffices to point out that the complaint and all the proceedings in this case assumed that the § 8(a)(3) violation was the refusal to retain Mirrione after the 1973–74 school year. The NLRB's finding of an anti-union motivation depends upon the circumstances surrounding the refusal to retain Mirrione in June. No inquiry was made into Nazareth's reasons for not hiring Mirrione in October.

As the § 8(a)(3) violation alleged in this case occurred on June 13, 1974 and specific charges concerning the violation were not filed until December 24, 1974, the claim is time-barred under § 10(b) and enforcement of that part of the NLRB's order relating to the alleged discriminatory failure to retain Mirrione is denied.

*Section 8(a)(1) Violations*

The NLRB found that Nazareth violated § 8(a)(1) through Principal Burke's anti-union remarks to the faculty at the beginning of the 1974–75 school year and through the activities of several department chairmen and coordinators in circulating anti-union letters and a decertification petition. Although the NLRB's finding that the principal's remarks violated § 8(a)(1) is sustained, its finding that the anti-union letters and decertification petition were circulated in violation of § 8(a)(1) is set aside for lack of evidence on the record as a whole. To violate § 8(a)(1), an employer must be found to have interfered with, restrained or coerced employees in the exercise of their § 7 rights. Normally,

coercion may be inferred from the fact that supervisors are involved in soliciting signatures on anti-union petitions. *See, Suburban Homes Corp.,* 173 N.L.R.B. 497, 500 (1968); *Big Ben Department Stores, Inc.,* 160 N.L.R.B. 1925, 1932–33 (1966), *enf'd,* 396 F.2d 78 (2d Cir. 1968). When the involved supervisors are also part of the bargaining unit, however, affirmative participation by the employer in the anti-union activity must be found to support a claim of coercion. *Powers Regulator Co.,* 149 N.L.R.B. 1185, 1188 (1964), *enf'd,* 355 F.2d 506 (7th Cir. 1966); *Hy-Plains Pressed Beef, Inc.,* 146 N.L.R.B. 1253, 1254 (1964); *Breckenridge Gasoline Co.,* 127 N.L.R.B. 1462, 1463 (1960); *Cosmopolitan Studios, Inc.,* 127 N.L.R.B. 788, 791 (1960); *Montgomery Ward & Co.,* 115 N.L.R.B. 645, 647 (1956), *enf'd,* 242 F.2d 497 (2d Cir.), *cert. denied,* 355 U.S. 829, 78 S.Ct. 40, 2 L.Ed.2d 41 (1957). In *Montgomery Ward,* the NLRB said that the employer would not automatically be held responsible for the anti-union activities of a supervisor included in the unit unless it was shown that the employer encouraged or ratified the supervisor's actions. 115 N.L.R.B. at 647. As there was no evidence in the present case of employer involvement in or encouragement of the anti-union letters or the decertification petition, and the supervisors involved were at all material times members of the bargaining unit, we conclude that the NLRB's finding of coercive anti-union activity by Nazareth is not supported by substantial evidence on the record as a whole and the ruling that these activities violated § 8(a)(1) is vacated and set aside.

In summary of the dispositions made with regard to the issues discussed, *ante,* we hold that the petitioner, Nazareth Regional High School, violated § 8(a)(1) and (5) in refusing to recognize and bargain with the union, Local 1261, American Federation of Teachers, AFL–CIO; and enforcement of the National Labor Relations Board's order with regard to these matters is granted. We are satisfied, however, that in the circumstances of the case, the petitioner never promised or agreed to employ all of the lay

teachers from the predecessor, Diocesan High School, on the same terms as those the lay teachers had with the predecessor school. The NLRB's order to compel restitution of wages and benefits is, therefore, limited to any wages and benefits lost because of a refusal to bargain with Local 1261 after September 1, 1974.

We also hold that Nazareth violated § 8(a)(1) through the threatening remarks made by Principal Burke on September 4, 1974, warning the employees against engaging in certain union activities; and enforcement of the NLRB's order to cease and desist from such unfair labor practices is granted.

We hold that the employee Mirrione's claim advanced by the NLRB that he had been denied employment by Nazareth because of the school's anti-union motivation need not be resolved on the merits because his claim was time-barred and enforcement is denied.

The NLRB also charged that there should be attributed to Nazareth, as employer, certain anti-union activities of supervisors, then members of the bargaining unit, in circulating anti-union letters and a decertification petition, threatening the employees' freedom to engage in union activities in violation of § 8(a)(1). We hold that this charge against Nazareth is wholly unsubstantiated, and enforcement is denied.

It is so ordered.