NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SAINT FRANCIS COLLEGE,
Respondent.

No. 76–2100.

United States Court of Appeals,
Third Circuit.

Argued June 6, 1977.
Decided Aug. 22, 1977.

Patrick Szymanski, John G. Burgoyne, John C. Rother, John S. Irving, John E. Higgins, Jr., Carl L. Taylor, Elliott Moore, Washington D. C., for petitioner.

Nick S. Fisfis, Patrick J. Basial, Pittsburgh, Pa., for respondent.

McNees, Wallace & Nurick, H. Lee Roussel, Norman I. White, Harrisburg, Pa., for amicus curiae Pa. Assn. of Colleges and Universities.

Charles H. Wilson, Williams, Connolly & Califano, for amicus curiae Nat. Catholic Educational Ass'n.

Before ALDISERT, ROSENN and HUNTER, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

The National Labor Relations Board [NLRB] has petitioned for enforcement of its unfair labor practice order against St. Francis College for refusal to bargain with the faculty union. Although first amendment and religious discrimination arguments have been presented, only basic principles of appropriate unit determinations are involved here. Because we find the exclusion of faculty Franciscans from the faculty bargaining unit to be unreasonable and arbitrary, the petition will be denied.

## I.

St. Francis College [the college] is a small private liberal arts college in Loretto, Pennsylvania. On October 21, 1974, the "St. Francis College Education Association, Pennsylvania Education Associate/NEA" [the union] filed a representation petition with the NLRB. The proposed faculty bargaining unit excluded those faculty members who are also members of the Franciscan Order. At the representation hearing the college objected, unsuccessfully, to the exclusion of the Franciscans.

■ On April 8, 1975, the union won the representation election. The college, however, refused to bargain, asserting again that the exclusion of the Franciscans vitiated the appropriateness of the bargaining

unit, as well as being a violation of their religious rights. At the ensuing unfair labor practice proceeding,[1] the NLRB held that the college had violated Section 8(a)(1), (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5). The Board's cease and desist order requires the college to bargain with the union. The college has still refused to bargain, so the NLRB petitions here for enforcement of its order.

## II.

The only issue before us is the appropriateness of the Board's determination of the faculty bargaining unit. Although the excluded faculty members are members of the Franciscan Order, their exclusion was based on grounds that are neutral in terms of religion.

A bargaining unit is that group of employees who will determine whether they will be represented by a union. If a majority of the group vote in favor of the union, then all members of the unit will be represented, as a unit, by the union in negotiations with the employer over wages, hours, and other conditions of employment.

Generally, units are chosen in terms of job descriptions and not of individuals who may have those jobs.[2] The National Labor Relations Act provides that "the Board shall decide in each case whether . . . the unit . . . shall be the employer unit, craft unit, plant unit, or subdivision thereof." 29 U.S.C. § 159(b).

■ The NLRB is given wide discretion in determining the bargaining unit.[3] The only statutory guidance is the goal of assuring employees "the fullest freedom in

1. This procedure is practically the only way the college could obtain judicial review of the unit determination, as that determination is not a final order. See 29 U.S.C. §§ 159(d), 160(f).

2. A statutory exception, not based on job description, is the exclusion of "any individual employed by his parent or spouse." 29 U.S.C. § 152(3).

3. The NLRB has only recently asserted jurisdiction over private colleges. Title 29 C.F.R. § 103.1 provides

The Board will assert its jurisdiction in any proceeding arising under sections 8, 9, and 10 of the Act involving any private nonprofit college or university which has a gross annual revenue from all sources (excluding only contributions which, because of limitation by the grantor, are not available for use for operating expenses) of not less than $1 million.

The novelty of applying management-union categories to the college teaching world has spawned difficulties and comments. E. g., 21 U.C.L.A.L.Rev. 63 (1973); 37 U.Pitt.L.Rev. 43 (1975); and 16 W. & M.L.Rev. 599 (1975).

exercising the rights guaranteed by this Act." 29 U.S.C. § 159(b). It has often been repeated that the NLRB need not select the most appropriate unit—any unit that is an appropriate one will do, even if there are several better possible units.[4] It follows that NLRB unit determinations are rarely disturbed.[5] As we have recently observed, in order to overturn an NLRB unit determination, we would have to find that the Board has acted in a manner that is "unreasonable and arbitrary." *Memorial Hospital v. NLRB*, 545 F.2d 351 (3d Cir. 1976).

■ In selecting units that will assure employees full freedom in exercising their section 7 rights—29 U.S.C. § 157—the Board often relies upon a criterion of "community of interest," looking at such factors as

(1) similarity in the scale and manner of determining earnings; (2) similarity in employment benefits, hours of work and other terms and conditions of employment; (3) similarity in the kind of work performed; (4) similarity in the qualifications, skills and training of the employees; (5) frequency of contact or interchange among the employees; (6) geographic proximity; (7) continuity or integration of production processes; (8) common supervision and determination of labor-relations policy; (9) relationship to the administrative organization of the employer; (10) history of collective bargaining; (11) desires of the affected employees; (12) extent of union organization.

R. Gorman, Labor Law: Unionization and Collective Bargaining 69 (1976). *Libbey-Owens-Ford Co. v. NLRB*, 495 F.2d 1195, 1200 (3d Cir.), *cert. denied* 419 U.S. 998, 95 S.Ct. 313, 42 L.Ed.2d 272 (1974); *Wil-Kil Pest Control Co. v. NLRB*, 440 F.2d 371, 375 (7th Cir. 1971).

The unit here included "all full time faculty" but excluded "members of the Franciscan Order." The unit consisted of 66 faculty members. Six full-time faculty members were excluded from the unit because they are members of the Franciscan Order.

According to the record, St. Francis College was founded by the Third Order Regular of St. Francis sometime over a century ago. In 1966, however, lay persons were elected to the college board of trustees, separating the college and the Order as two distinct, non-profit entities. In the fiscal year 1973–74, the Order released the college from debts resulting from the Order's original investments in exchange for a tract of land. Also during that year, for the first time Franciscan faculty members were placed under contractual agreements "largely identical" to those the lay teachers had. In the words of President's Report for that year, the Franciscans no longer volunteered the greater part of their time for college work, but were paid in full for the specific job for which each had been hired. The report also noted that the Franciscans "donated to the College, from the amount received through salaries, a total unrestricted gift [of approximately 50% of the salary amounts]." Ex. 2, p. 3.

At the representation hearing the mechanics of that donation were sorted out as follows: The Franciscan faculty had the right to receive their own paychecks. The college vice-president testified specifically that if a Franciscan asked to have his salary check sent to him individually, the college would comply. Instead, because each Franciscan had taken a vow of poverty, each had asked the college to send the checks directly to the St. Francis monastery, where the Franciscan faculty live. About eighteen or nineteen Franciscans live at that particular monastery; they are not all involved with

---

**4.** *E. g., NLRB v. Western & Southern Life Insurance Co.*, 391 F.2d 119, 122 (3d Cir. 1968).

**5.** The Supreme Court admonished, in *Packard Motor Car Co.*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947), that the determination of an appropriate unit "involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed."

work at the college—indeed, only the six faculty members concern us here.[6]

The monastery functions as an individual unit within the larger Franciscan Province. The monastery pays its members' living expenses, and cares for the old, infirm or needy Franciscans. The additional money, which is contributed to by the individuals residing at the monastery, is then divided by the monastery among favorite charities, of which St. Francis is a prime recipient.

Of the available fringe benefits, the Franciscans participate in the short-term income disability plan, but not in the pension or medical insurance programs. In all other respects—concerning wages, hours, and conditions of employment—the Franciscans are treated the same as lay faculty members.

### III.

The exclusion of the Franciscans was based on the Board's decision in *Seton Hill College*, 201 NLRB No. 155, 82 LRRM 1434 (1973). In *Seton Hill*, the college buildings and grounds were owned by the Order of the Sisters of Charity of Seton Hill [the Order]. The college, separately incorporated, leased the college property for one dollar a year. Half of the college board of trustees were Sisters of the Order. The Mother General of the Order was a trustee; the local bishop was honorary chairman.

On the faculty were 34 lay teachers and 58 Sisters of the Order. The Sisters were referred to the college by the Mother General, and hired by the college president, also a Sister

in the same manner and under the same standards that apply to the lay faculty The College has a uniform salary scale which, on its face, applies to all members of the faculty. All faculty members sign a standard form employment contract and work the same number of hours. They have similar teaching assignments in all the departments. . . . All fac-

ulty members enjoy academic freedom, tenure, and faculty status.

82 LRRM at 1434.

Nonetheless the Sisters were excluded from the faculty bargaining unit. The differences stressed by the Board were 1) the Sisters took vows of poverty, and of obedience to the Mother General—a basic obedience relating to the year's assignment; 2) the Sisters did not receive remuneration directly from the college: their wages, less living expenses, were paid directly to the Order which, by agreement with the college, returned a fixed percent of the salaries as an annual gift; 3) the Sisters' life and medical insurance premiums were paid by the Order; 4) the Sisters were not eligible for Social Security and did not participate in the faculty insurance and annuity program; and 5) the Order provided housing for the Sisters.

Altogether, these differences meant, according to the Board, that the Sisters lacked a "community of interest" with the lay faculty members. Community of interest is used by the Board as a guide in selecting a unit whose members will have similar interests in their wages, hours, and other conditions of employment. However, it has not been traditionally applied as an inquiry into employee states of mind, motives, or individual preferences. Thus it was a significant departure from precedent when the Board in part based its exclusion of the Seton Hill Sisters on the following reasoning:

The guts of collective bargaining is negotiating for wages and Fringe Benefits. The sisters *are not interested in wages* since they take a vow of poverty, which includes wages.

82 LRRM at 1435 (emphasis added).

The other ground for exclusion in *Seton Hill* was the conclusion that the faculty Sisters were "also in a sense part of the employer" since the Order owned and administered the college. Pointing to general ties of allegiance to other Sisters and a vow of obedience to the Mother General, herself a college trustee, the NLRB concluded that

---

**6.** Of the board of trustees, the testimony was that only the college president resides at the monastery. Of the Franciscan college administrators, a few live at a nearby monastery.

the faculty Sisters "would therefore be subject to a conflict of loyalties" if they were included in the bargaining unit. As an example, the Board noted that a strike is often necessary to enforce union demands, but "[t]he Sisters own the college and would not strike themselves." Here again the Board was relying on employee states of mind which it inferred from "general allegiance" and a "vow of obedience."

St. Francis College objects to the Board's reliance on *Seton Hill* on several grounds. First, it would have us distinguish this case from *Seton Hill*. Unlike *Seton Hill*, there is no evidence that the Franciscan Order owns and administers St. Francis. St. Francis College is a nonprofit corporation holding title to all the college property. The college is administered by a board of trustees, eight of whom, including the chairman, are Franciscans and seven are lay; each trustee, says St. Francis, has a civil fiduciary obligation to act for the benefit of the college. Unlike *Seton Hill*, the Franciscans apply independently for teaching positions at St. Francis, just as the lay applicants do. Finally, although the salaries go to the monastery which in turn makes a substantial gift to St. Francis, that gift is voluntary and, unlike *Seton Hill*, is not made pursuant to any contractual obligation between the monastery and the college.

Secondly, the appellee, St. Francis College, contends that the reasoning of *Seton Hill* has been seriously undermined by Board decisions rendered after the decision in *St. Francis*. It points in particular to *D'Youville College*, 225 NLRB No. 104, 92 LRRM 1578 (1976), and *Niagara University*, 227 NLRB No. 33, 94 LRRM 1001 (1976).

In *D'Youville*, the religious faculty (Grey Nuns) were included in the bargaining unit. The Regional Director had excluded them, on the basis of *Seton Hill*, but the Board disagreed. First, the Board found the nuns were not "in a sense part of the employer"

as they were in *Seton Hill*. The only differences mentioned were that the D'Youville corporation owned all of its college property and there was a restriction that no more than one-third of the trustees could be members of religious orders. The Board concluded: "Consequently, there is no basis for holding . . . that the four nuns are in any manner affiliated with the Employer except in their capacity as faculty members signing a standard employment contract." The second distinction from *Seton Hill* was that in *D'Youville* all the parties wanted the nuns included. This outweighed the apparent schism in the community of interests caused by the nuns' vows of poverty, which, as in *Seton Hill*, meant that the nuns turned over all but living expenses as a gift to the college.

In *Niagara University, supra, Seton Hill* was again distinguished, and some of the religious faculty (one priest and three nuns) were included in the faculty bargaining unit. The university was operated by the Vincentian Fathers, Eastern Province. *Seton Hill* was distinguished because the four faculty members were members of another Province and thus their vows of obedience were too indirect a link between them and the Vincentian Fathers of the Eastern Province to support their classification as "part of the employer." Secondly, even though the religious faculty turned over their salaries to their orders, the Board found

> the size of their paychecks is a matter of objective consequence to them, for the excess over their expenses goes to support the various activities of their own orders which include care for sick and retired members, and, in the case of Father Lachowski, maintenance of a preparatory school for indigent boys.

94 LRRM at 1002. The Board attenuated its interest in vows of obedience [7] and vows of poverty. With regard to poverty vows,

---

7. In its own words:

    Also, we believe it is of some consequence to note that the testimony in this record is consistent to the effect that the *obligations under the vow of obedience are concerned with matters of religion and not with the* *individual's professional conduct as a professor,* or with their activities with respect to labor or other professional organizations. There is no contrary evidence.

94 LRRM at 1002 (emphasis added).

the Board admitted: "In short, we do not believe that the way a person chooses to spend his or her money is a relevant consideration with respect to questions of unit placement." 94 LRRM at 1003 (footnote omitted). In accompanying footnotes, the Board went further:

> the alleged pertinence of questions on how money is spent seems in part to rest on an unstated and unproven assumption that a desire for income is somehow related to the particular manner in which it is spent; i. e., on how much it is needed. *The whole concept here is at best a morass with which this Board has no special expertise to deal. Furthermore, it is beside the point.*

94 LRRM at 1003, n.6 (emphasis added).[8] Indeed, the Board went so far as to say the Hearing Officer should not have allowed the questions on what the religious faculty did with their salary checks "except to the extent such questioning was limited to whether they returned all or part of their salary to the Employer." 94 LRRM at 1003, n.7.

Thus, there has definitely been a shift in the Board's analysis of religious faculty members' interests. Prior to *Seton Hill,* too, religious faculty had been included.[9]

## IV.

▪ At the outset we note that we are not here concerned with a first amendment problem, or with religious discrimination. The Board's exclusion of the Franciscans was based solely on grounds having nothing to do with religion. We find those grounds to be arbitrary and unreasonable.

In reviewing the appropriateness of a unit determination, we of course acknowledge the wide discretion in the Board. Nonetheless, it cannot proceed in an unreasonable or arbitrary manner. And, as we said in *Memorial Hospital v. NLRB,* 545

F.2d 351, 357 (3d Cir. 1976), if the Board has reached different conclusions in prior cases, "it is essential that the 'reasons for the decisions in and distinctions among these cases' be set forth to dispel any appearance of arbitrariness."

An objective description of the teaching jobs involved here would reveal no differences, other than minor fringe benefits, in wages, hours, and working conditions between the Franciscan and lay faculty members. Normally, the NLRB would not fragmentize a homogeneous group of employees. *See NLRB v. Convair Pomona,* 286 F.2d 691 (9th Cir. 1961). In the *Seton Hill* line of decisions, however, the Board has excluded some from an apparently homogeneous group of teachers.

The Board denies any appearance of arbitrariness in this area, relying particularly on *Nazareth Regional High School v. NLRB,* 549 F.2d 873 (2d Cir. 1977), where the Board's exclusion of religious faculty was affirmed by the second circuit. In that case, however, the religious faculty were paid "substantially less" than the lay faculty. The Board would have us follow that case on the reasoning that at St. Francis the Franciscan faculty have the "economic benefit" of substantially less than they are paid, due to their vows of poverty. Also, because the college receives a gift from the monastery totalling close to 50% of the Franciscan faculty salaries, the Board contends that the college in effect pays the Franciscans about half of what it pays the lay faculty.

Evidence in the record is all to the contrary. At St. Francis, Franciscans do receive a full salary, making *Nazareth* inapposite.

On appeal the Board has relied on two major grounds to justify its exclusion of the Franciscans, both neutral in terms of reli-

---

**8.** As an example of the irrelevance of a desire for money, the Board considered an independently wealthy lay professor, who would not be excluded on grounds of not caring about income or pay raises.

**9.** In its first decision on this issue, the Board included Jesuit faculty members, determining that they shared a community of interests with the lay faculty. *Fordham University,* 193 NLRB No. 23, 78 LRRM 1177 (1971). Without explanation *Seton Hill* overruled *Fordham* to the extent of any inconsistency.

gion. One is that "the special and complex relationship" between the Franciscan faculty and the college would present a conflict of loyalties for the Franciscans. The second is that the differences in salary and fringe benefit arrangement mean the Franciscans' economic interests differ significantly from those of the lay faculty.

Conflict of loyalties is not a well-defined guideline in selecting bargaining units. Normally, as we said, units are determined without reference to the particular individuals who hold the "unit" jobs. At its worst a test like "conflict of loyalties" can be used to exclude pro-management, anti-union employees from a bargaining unit.[10]

In this case, the alleged conflict of loyalties is bottomed on the "family resemblance" among Franciscans. On appeal, the Board argues less that they are "in a sense part of the employer"—the *Seton Hill* rationale—and more that they owe various forms of allegiance to each other. Specifically, the exclusion of the Franciscans is compared to the exclusion of relatives of management, as in 29 U.S.C. § 152(3) and in *NLRB v. Caravelle Wood Products, Inc.,* 504 F.2d 1181 (7th Cir. 1974).

Whatever our views may be on family relationships such as those extolled by the *Caravelle* court, the Franciscans are not blood relatives of each other, so we turn to the particular elements which, according to the Board, would create a conflict of loyalties by the Board. Unfortunately, those elements have not been clearly defined by the Board. The Regional Director denied the college's request to have the Franciscans included on the general authority of *Seton Hill.* The NLRB in the unfair labor practice proceeding did not offer any additional reasons. On appeal, the Board specifies only an amalgam of "overlapping relationships present here—some adversary,

some of obedience, some of identity of commitment" between the Franciscan faculty and the administration and trustees of the college, as sufficient to distinguish their interests from those of the lay faculty.

Taking these relationships one at a time, we have first an "adversarial" interest which we think can be eliminated as not a differentiation at all between religious and lay faculty, all of whom as faculty have an adversarial relationship to the college as employer. The relation of obedience apparently refers to the vow of obedience which, as far as the record shows, pertains to religious matters only, and as such is irrelevant to the employee-employer relationship. The identity of commitment is harder to pin down, because the record is bare of references to commitments.[11] In sum, there is nothing in the record to support a finding that the Franciscan faculty, through vows of obedience or shared commitment, differ from the lay faculty in terms of their employee-employer relationship. *See Niagara University v. NLRB,* 558 F.2d 1116, Nos. 76–4268, 77–4027 (2d Cir. July 21, 1977).

We turn next to the second ground of exclusion—the differences in salary and fringe benefit arrangements. First of all, we note again that the salaries paid to the Franciscans are identical to those paid to the lay faculty, so there are no differences in salary. Of the fringe benefits, the short-range salary continuation plan, tuition remission plan, reciprocal tuition arrangement, and sabbatical leave, are all participated in by the Franciscans. They do not, however, participate in the medical, pension, and long-range salary continuation programs. Those differences are very minor in terms of overall wages, hours, and other conditions of employment, and have not caused employee exclusion in the past. *See Vindicator Printing Co.,* 146 NLRB No. 106, 55 LRRM 1429 (1964).

---

**10.** See Judge Stevens' dissent in *NLRB v. Caravelle Wood Products, Inc.,* 504 F.2d 1181, 1189 (7th Cir. 1974) (dissent) (new category may be identifiable only by "probable opposition to the union at election time").

**11.** Perhaps this is where the "general allegiance" as opposed to a vow of obedience,

comes in: as a close fraternal group all Franciscans are presumed always to ally themselves by religious ties rather than by other, *e. g.,* working, relationships. All we can say is that is mere speculation by the Board. There is simply no basis in the record for that inference.

The salary difference emphasized most by the Board on appeal is that the Franciscans have their salary checks sent to their own monasteries. This is supposed to be significant in two respects. First, because they do not spend the money on themselves—due to a vow of poverty—they are presumed to be less interested in how much of a salary they earn. Second, because the majority of the salary money goes to the St. Francis monastery which in turn makes generous gifts to St. Francis college, the Franciscans are said to be paid less, in practice, than the lay faculty. Neither inference is supported by the record.

As far as the Franciscans' interest in wages is concerned, we have several observations. First, the uncontradicted testimony in the record is that the Franciscans do have an interest in the size of their salaries. When asked to agree that the Franciscan faculty did not have any real interest in their salaries, the college witness responded

A No there I think you are absolutely wrong.

Q Where is the interest?

A The interest is on several levels. First of all, on a Professional level, you can, I think about a [Franciscan] who has spent the same amount of time studying for a particular degree as a lay man, and then beyond what the lay man studies are for an extra four or five years, to study for the priesthood, and he has a very definite interest.

Q Is it a matter of ego?

A I suppose that could very well be true? [A] very personal interest in being remunerated on the same level as a man who is on the same level professionally as he is.

Q Well let's remove the ego, now what is the interest?

A I think that a [Franciscan] realizes that when he joins the community he has certain obligations to the community, the community has expenses the same [way] as a family has expenses.

.    .    .    .    .

Q Well there is no pressure on [Franciscans] to bring in any additional money if you will?

A No, you are wrong, there certainly is.

.    .    .    .    .

Q And there is no pressure on the [Franciscans] at this particular monastery to go out and get more money, the [Franciscans] here do not have to moonlight on the weekends?

A Yes we do, well I don't say that we have to, but we do, in fact, and that probably accounts for the surplus.

Tr. 62–64.

The obligations to his community—the monastery and the Province—were particularized and compared to another's obligation to provide income to his family:

The [Franciscan] is a voluntary member of a group and pledges himself to the obligations of that group and as a group the Province or the Order has certain financial commitments, we have our commitment to the old people, we have a commitment to the young people and in the training of them and as to our missions we supply them with money.

Tr. 57.

Moreover, according to the record, the only time a faculty member has refused to sign a contract until salary was increased, that member was also a Franciscan.[12] Also we see no support for a general rule that employees who spend less on themselves, or have less need of money, lack a sufficient interest in their wages.

More importantly, even if this were so, we can point to no expertise developed by the Board in this area to differentiate among needs and interests in money. As it has recognized itself, "[t]he whole concept here is at best a morass with which this Board has no special expertise to deal." *Niagara University, supra* at 1003 n. 6. The Board has applied its "interest in wages" test in a manner that can only be called arbitrary.

*Granfield v. Catholic University,* 174 U.S.App. D.C. 183, 530 F.2d 1035 (1976).

---

12. In this regard we note a case brought by two faculty priests who wanted an increased salary,

Our final observation on interest in wages is that its relevance in determining appropriate bargaining units has never been demonstrated. Until it is, we too would hesitate to plunge into the morass of needs and interests in sorting out employees into bargaining units. Any conclusion that because employees spend less on themselves, or have other sources of income, they are therefore less interested in their work income is sheer speculation.[13]

That brings us to the second point—the Board's tortuous reduction of a "full" salary to a "half" salary.[14] The simple response is, again, that the Franciscans do receive a full salary, not one that is "substantially less" as in *Nazareth, supra.* *See Niagara University v. NLRB, supra.* If it is irrelevant what they do with their salaries it must also be irrelevant that the monastery to which they give their salaries itself makes a substantial gift to the employer college. As faculty members, they do not directly return part of their salary, and even if they did we cannot see why this should exclude a faculty member from a bargaining unit. At any rate the gift here is by the monastery, not the individual faculty members, and it is a gift, not an obligation. We fail to see how the monastery's generosity diminishes the salary earned by a Franciscan faculty member.

### V.

In conclusion, we find that the Board has abused its discretion in excluding Francis-

cans from the St. Francis faculty bargaining unit. In finding the Franciscans lack a community of interest with lay faculty the Board resorted to speculation, in an unreasonable and arbitrary manner, and its bargaining unit cannot be upheld as an appropriate unit. Accordingly, we do not reach any of the first amendment or religious discrimination arguments.[15] Because the Board exceeded its authority in excluding Franciscans from the bargaining unit, its petition to enforce the unfair labor practice order against St. Francis College will be denied.

An order to that effect will be entered.

ROSENN, Circuit Judge, concurring.

I agree that the Board abused its discretion in excluding Franciscans from the St. Francis faculty bargaining unit. I write separately for two purposes: first, to express my perception of the inadequacy of the Board's proffered explanations for the exclusion, and, second, to emphasize the limitations of the court's decision.

### I.

The Board has stated that community of interest in wages, hours, and working conditions is the "prime determinant of whether a given group of employees constitutes an appropriate [bargaining] unit." *Continental Baking Co.,* 99 N.L.R.B. 777, 782 (1952). *Accord, NLRB v. Caravelle Wood Prods., Inc.,* 504 F.2d 1181, 1183 (7th Cir. 1974);

---

**13.** Speculation by the Board that social security recipients who deliberately worked part-time to keep earnings down would not share the interest in wages was held totally unreasonable by the Sixth Circuit, in *Indianapolis Glove Co. v. NLRB,* 400 F.2d 363, 368 (6th Cir. 1968) (motive for working part-time irrelevant).

**14.** In its reply brief, the Board explains: ". . . [T]he religious faculty have no real power to prevent the payment [monastery's gift] to the College. It is clear, therefore, that the payment by the College of a nominal full salary to the religious faculty, accompanied by what amounts to a guaranteed refund of about 50% of that salary, is the practical equivalent of paying the religious faculty a salary half that paid to the lay faculty." Reply brief, 3.

**15.** The college argues that the exclusion of Franciscans violates 1) the free exercise clause and the establishment clause of the first amendment, 2) Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(c), and 3) the equal protection guarantee of the due process clause of the fifth amendment.

As amici, the Pennsylvania Association of Colleges and Universities, and the National Catholic Educational Association, College and University Department, also urge religious discrimination as ground for overturning the NLRB's exclusion of the Franciscans.

In light of our analysis, based on non-religious neutral principles for appropriate unit determinations, we find it unnecessary to reach the issues of religious discrimination.

*Wheeler-Van Label Co. v. NLRB,* 408 F.2d 613, 617 (2d Cir.), *cert. denied,* 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969); *see NLRB v. Quality Markets, Inc.,* 387 F.2d 20, 22–23 (3d Cir. 1967). In this case, the Board concluded that, for two reasons, the Franciscan faculty members lacked the requisite community of interest with the college's lay faculty. The Board determined that (1) differences in salary and fringe benefit arrangements between religious and lay faculty and (2) the "special and complex relationship" between Franciscan faculty and the college supported the exclusion of religious faculty members from the bargaining unit. I believe that the first basis for the exclusion was arbitrary and unreasonable and that the second was unsupported by the evidence of record.

### A.

The Board asserts that because the Franciscans "assign" their salaries to their monastery, which in turn donates approximately half of the assigned amount to the college, the religious in effect receive only half the salary paid to lay faculty members. For this reason, the Board maintains, and because the Franciscans' poverty vow generally circumscribes their control over the money they receive, the religious do not share the lay faculty's interest in remuneration. The same premise, of course, underlies both reasons—that interest in receiving wages can be deduced from the use to which the wages are put.

I do not believe that an employee's subjective interest in the compensation he or she receives should be considered by the Board in determining whether that individual shares a community of interest with his or her fellow employees. When the Board ventures into the mysteries of individual motivation, it renounces the reasoned decision-making that is its statutory charge and pursues instead a course of unavoidable speculation. *See generally Indianapolis Glove Co. v. NLRB,* 400 F.2d 363, 368 (6th Cir. 1968). The Board itself has acknowledged that it has no special expertise in appraising an employee's desire for income,

*Niagara University,* 227 N.L.R.B. No. 33, 94 L.R.R.M. 1001, 1003 n. 6 (1973), and has generally avoided attempting such assessments outside the religious faculty cases. I believe that the traditional *objective* tests used by the Board to determine community of interest, *see* majority opinion at p. 249, are more than adequate to guide the selection of appropriate bargaining units, and should not be adulterated with subjective inquiries. The factors that the Board has historically considered are, unlike subjective individual concerns, easily ascertainable and subject to intelligent judicial review.

In this case, the Board's analysis of the employees' community of interest in wages should have terminated once the Board concluded that the scale and manner of determining earnings were identical for lay and Franciscan faculty members. Instead, the Board went further and inquired into the Franciscans' subjective interest in their income. The method of executing that inquiry—inferring an employee's interest in receiving wages from the use to which the wages are put—underscores the speculation inherent in the inquiry itself. It is unreasonable to assume, as the Board did, that because the religious do not spend their income on themselves they have less interest in their earnings than lay employees: a self-denying employee may well have a great interest in the measure of his beneficence. It is equally unreasonable to assume, as the Board did, that because a portion of the Franciscans' earnings is indirectly returned to the college as a contribution that they have less interest in their salary than lay employees. The salary concerns of an employee who knows that a part of his earnings will be returned to the eleemosynary institution by which he is employed can be complicated; furthermore, such an employee may retain more interest in the fraction of his earnings that he does not contribute than a typical employee retains in his entire salary.

Even if the employees' philosophical or pragmatic interest in wages could be ascertained without speculation, which I doubt, the use of such a criterion entails a

line-drawing among individuals that can only be described as arbitrary. In my view, any exclusion of employees from a bargaining unit which rests on the Board's estimate of the employees' subjective interest in salary is per se unreasonable.

The evidence in this case establishes that the lay and Franciscan faculty members are paid according to the same scale, and that the manner of determining earnings for both groups is the same. That evidence was sufficient to make out a community of interest in wages. Differences in fringe benefit arrangements were too insignificant to suggest any difference in interests between the two groups. The Board's first reason for excluding the Franciscans from the bargaining unit is, I conclude, without any rational basis.

### B.

The Board's second reason for barring the Franciscans from the unit was the "special and complex" relationship between Franciscan faculty members and the college. Had any objective evidence been adduced to establish the nature of that relationship, this reason might have constituted a valid basis for the exclusion. To be sure, there was evidence that the Franciscans take a vow of obedience, but that pertains to religious matters only. And there was testimony regarding the historical relationship between the college and the Order, but no meaningful description of the present connection between Franciscan employees and the college. The record simply does not support the inference that, for purposes of collective bargaining, the relationship between the religious faculty members and the employer is any different from the relationship between lay faculty members and the employer.

The Board blindly attributed an all-pervasive homogeneity of views to the Franciscan faculty members and the Franciscan administrators, assuming that the Franciscans' religious identity eclipsed the usual employer-employee relationship. The nature of a religious commitment, however, is too complex to be explained by such factu-

ally unsupported assumptions. The record in this case suggests that these Franciscans are anything but automatons who have surrendered their facility for intelligent and voluntary decisionmaking. On the contrary, the record tends to show that, as far as their employment is concerned, the religious faculty members are independent-thinking individuals who are not under the domination of the college's Franciscan administrators.

An employee's relationship to the administrative organization of his employer has been a factor in determining whether that employee has a community of interest with his fellow employees. But when the Board invokes that relationship to exclude an employee from a bargaining unit, it should be certain that its action is supported by record evidence. The requisite support is lacking in this case.

### II.

The Board's determination of an appropriate bargaining unit necessarily depends on the facts of a particular case. Similarly, a reviewing court's approval or disapproval of that determination depends on the Board's proffered explanations for its decision and on the record support for those explanations. Accordingly, I would emphasize the limited effect of our holding here. We decide only the case before us. We most certainly do not suggest that religious faculty members can never be excluded from a faculty bargaining unit. A future case which presents different bases for the exclusion supported by evidence of record will be decided on its own merits.