**NIAGARA UNIVERSITY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 1046, 1047, Dockets 76–4268 and 77–4027.

United States Court of Appeals, Second Circuit.

Argued May 20, 1977.

Decided July 21, 1977.

---

Herbert D. Schwartzman, Jamaica, N. Y. (Flaherty, Cohen, Grande & Randazzo, Buffalo, N. Y., Joseph L. Randazzo, Buffalo, N. Y., on the brief), for petitioner.

Patrick J. Szymanski, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C.), for respondent.

Before MOORE, SMITH and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is a petition by the employer Niagara University (Niagara) to review and set aside a decision and order of the National Labor Relations Board (the Board) issued on November 17, 1976, reported at 226 N.L.R.B. No. 154. The Board has made a cross-petition for the enforcement of its order. The petition is granted and the cross-petition is denied.

I

Niagara is a Roman Catholic institution of higher learning located in Niagara, New York which was founded by the Congregation of the Mission more commonly known as the Vincentian Order. It was chartered by the Regents of the University of the State of New York in 1883. The composition of the faculty is part lay and part religious. On August 8, 1975 the Niagara University Lay Teachers Association (the Union) filed a representation petition with the Board seeking to represent a bargaining unit comprised of all full-time lay faculty employed at the University. This proposed unit would have excluded all faculty who were members of religious orders. At the representation hearing Niagara contended that the appropriate unit was one that included all full-time faculty both lay and religious. The decision of the Regional Director dated October 3, 1975 found that the full-time faculty consisted of 134 lay and 21 religious members. The latter was comprised of 18 Vincentian Fathers, 17 in the Eastern Province and one in the New England Province, and three nuns from differing religious orders, one of whom was a Daughter of Charity under the jurisdiction

of the Superior General of the Vincentian Order. The Regional Director concluded that the Vincentian priests and the Daughter of Charity did not share a "community of interest with the lay faculty" and therefore they were excluded from the unit.[1] The Board by a two-to-one vote denied review of the decision because it raised no substantial issue.

On December 17, 1975 an election was conducted in which the Union prevailed by a vote of 81 to 46 and was certified by the Board as the exclusive representative of the full-time lay faculty on December 29, 1975. On April 12, 1976 the University sent employment contracts for the 1976–77 academic year directly to the individual faculty members represented by the Union. In May 1976 the Union requested that Niagara bargain with respect to rates of pay, wages, hours and other terms and conditions of employment. Niagara refused to so bargain in order to obtain judicial review of the Board's unit determination. The Union filed an unfair labor practice charge and on June 7, 1976 the Board issued a complaint charging Niagara with refusing to bargain in violation of §§ 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (1). On June 15, 1976 the University answered defending on the ground that the unit was inappropriate since it excluded the full-time religious faculty. On July 22, 1976 the Board denied Niagara's petition for reconsideration. General Counsel filed a motion for summary judgment which was granted on November 17, 1976. The Board held in its decision on that motion that Niagara had engaged in unfair labor practices under §§ 8(a)(1) and (5) of the Act. This petition for review was filed by Niagara on December 6, 1976.

## II

■ Admittedly the scope of review here is narrow. The determination of the appropriate bargaining unit involves an ex-

ercise of informed discretion by the Board and its decision will rarely be disturbed. *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947). However, as we have consistently held, where the Board's order is not supported by substantial evidence or is either arbitrary or unreasonable, this court will deny enforcement. *E. g., Szabo Food Services, Inc. v. NLRB,* 550 F.2d 705, 707 (2d Cir. 1976); *NLRB v. Solis Theatre Corp.,* 403 F.2d 381, 383 (2nd Cir. 1968); *Empire State Sugar Co. v. NLRB,* 401 F.2d 559, 562 (2d Cir. 1968). We hold that here the Board's order was arbitrary and inconsistent with its clarification order as well as its prior decisions and that its conclusions were not supported by substantial evidence in the record.

## III

The Regional Director whose findings were not disturbed by the Board found that the "University (Niagara) holds title to all the buildings and property on the campus." Moreover, the Regional Director found that:

Niagara University is governed by a seventeen member Board of Trustees, of whom not more than one-third shall be priests of the Congregation of the Mission generally referred to as the Vincentian Fathers.

At the present time, five members of the Board, including the Chairman, are members of the Vincentian Fathers. Further, the Provincial of the Congregation of the Mission, Eastern Province of the United States is required by the University statutes to be an ex-officio member of the Board.

In addition, the Statutes of Niagara University provide in part:

By virtue of the provisions of the charter granted and amended by the Regents of the University of the State of New York and by virtue of section 226 . . . of

---

1. On February 10, 1976 Niagara filed a petition with the Board for clarification of the unit. On December 16, 1976, after the filing of the University's petition for review by this court in the instant case, the Board decided in the unit

clarification proceeding that the three nuns plus the Vincentian Father in the New England Province belonged in the bargaining unit and amended that unit to reflect this change. 227 N.L.R.B. No. 33.

the Educational (sic) Law of the State of New York, the Board of Trustees of Niagara University is vested with all the powers, privileges and duties and subject to all the limitations and restrictions prescribed for colleges and universities by law or by the ordinances of the University of the State of New York.

The basis for the Regional Director's conclusion that the Eastern Vincentians should not be included in the unit was that they did "not share a community of interest with lay faculty." In reaching this determination, the Regional Director relied on the vow of poverty taken by the Vincentians, their communal living arrangements which meant sharing quarters with some persons who were supervisors, the fact that these men, unlike the lay faculty, did not have written contracts and were not eligible for tenure and that they could be reassigned by their supervisors at any time.

In support of this conclusion here, the Board urges that this case is controlled by its decision in *Seton Hill College,* 201 N.L.R.B. 1026 (1973). However, in *Seton Hill,* labelled by the Board as its leading decision in this area, the college was owned and operated by the Order of the Sisters of Charity of Seton Hill. The Order held legal title to the buildings and grounds of the college and the college rented these grounds for one dollar a year. Fifty percent of the membership of the board of trustees were Sisters of Charity of Seton Hill. Of the 98 faculty members, 58 were members of the Order. The Board found that the interests of the Order were also those of the employer.

It is obvious that the identity of interest that existed in *Seton Hill* is totally different from that existing at Niagara. As the Regional Director found, the University and not the Vincentians owned all legal title to the grounds and buildings.[2] Furthermore,

the Vincentians could never constitute more than one-third of the Board of Trustees of Niagara.

Rather than *Seton Hill,* the Board decision most directly in point on this issue is *D'Youville College,* 225 N.L.R.B. No. 104, 92 L.R.R.M. 1578 (1976). There, although the college was founded by the Order of Grey Nuns of the Sacred Heart, the Board pointed out:

> However, around 1970 the College was reorganized as a corporation under the laws of the State of New York. At that time a board of trustees was established and vested with ownership of the Employer's buildings and other property and given responsibility to establish the policy and to administer the affairs of the college. It is specified by the corporate charter that no more than one-third of the members of the board of trustees may be members of religious orders, including the order of Grey Nuns. Consequently, there is no basis for holding in this proceeding that the four nuns are in any manner affiliated with the Employer except in their capacity as faculty members signing a standard employment contract.

92 L.R.R.M. at 1578–79.

The Board's recognition that the Board of Trustees operated D'Youville thus eliminated any religious faculty identification with the employer. This same factor has been overlooked here where the governance of the University is also vested in the Board of Trustees, only one of whose members must be a member of the Vincentian Fathers, Eastern Province and no more than one-third of whose members can be Vincentian Fathers irrespective of their Province.

---

**2.** In the clarification proceeding which ordered the inclusion in the unit of the three nuns and the Vincentian priest who was a member of the New England Province, the Board referred on several occasions to the operation and ownership of the University by the Eastern Province Vincentians. 227 N.L.R.B. No. 33. This conclusion was totally unsupported by the evidence and, as indicated, was contrary to the findings of the Regional Director. However, this arbitrary assumption by the Board was necessary to support its purported distinction between the Eastern Vincentians and the other religious faculty.

### IV

The second reason given by the Board in *Seton Hill* for excluding the nuns was the vow of poverty taken by them. The Regional Director here also relied on the fact that all the religious included in the full-time faculty had taken "simple and private vows of poverty, chastity and obedience." The opinion however stressed that:

Under his vow of poverty, a Vincentian Father has a right to ownership but can not use the property without the permission of his superiors. All monies earned by the Vincentian Fathers are given to their Provinces and they in return receive a monthly personal allowance. Further, the members of the Order are provided with food, clothing and shelter by their Provinces.

The question then is whether the vow of poverty taken by the Vincentian Fathers prevents their having such a community of interest with the lay faculty so as to preclude them from appropriately being included in the bargaining unit.[3] We face the fact that the Board's position in its clarification decision is inconsistent with the position taken on this appeal. In that proceeding, the Board found that the three nuns and the New England Province Vincentian who were full-time teachers at Niagara had all taken the vow of poverty. With respect to them the Board held:

In these circumstances we fail to see any significant difference—at least with respect to unit placement—between Sister Minella [one of the three nuns teaching full-time at Niagara] and an unmarried lay professor who may choose to live an austere life in material terms and to contribute much of his earnings to, for example, charity or scientific research. Certainly, no serious contention would be

entertained that such a professor could not properly belong in a lay faculty unit. In short, we do not believe that the way a person chooses to spend his or her money[6] is a relevant consideration with respect to questions of unit placement.[7]

227 N.L.R.B. No. 33 at 6–7.

In footnote 6 the Board stated,

The alleged pertinence of questions on how money is spent seems in part to rest on an unstated and unproven assumption that a desire for income is somehow related to the particular manner in which it is spent; i. e., on how much it is needed. The whole concept here is at best a morass with which this Board has no special expertise to deal. Furthermore, it is beside the point. To take an example, an independently wealthy lay professor would not be excluded from a unit simply because he or she did not "need" the income or had no interest in a pay raise.

Id. at n. 6.

In footnote 7 the Board ruled that,

In view of this conclusion, we find that the Hearing Officer erred in overruling the objections to his own questions concerning what the religious faculty here involved did with their salary checks, except to the extent such questioning was limited to whether they returned all or part of their salary to the Employer. However, in the circumstances, the error was, as we have held above, nonprejudicial. We also wish to note here that questions concerning how the fathers and sisters arrange for the purchase of their habits, shoes, and any or all other personal items are irrelevant and involve personal matters of no proper concern of this Board.

Id. at n. 7.

If then the Board realized that there was no necessary nexus between the vow of poverty and the interest in a pay raise and

---

**3.** While the Regional Director's opinion stressed the vow of poverty, the Union argued to the Board in the clarification proceeding that the vow of obedience disqualified all members of the religious faculty from inclusion in the unit. The Board found, however, "that the obligations under the vow of obedience are concerned with matters of religion and not with the individual's professional conduct as a professor, or with their activities with respect to

labor or other professional organizations. There is no contrary evidence. In short, we can conceive of no basis for concluding that the religious vow of obedience, *ipso facto,* as the Union seems to argue, requires exclusion of the religious faculty in the issue from the unit." 227 N.L.R.B. No. 33 at 5.

The Board on this appeal understandably has not raised the issue of the vow of obedience and we do not consider it an issue.

included the four religious in question in the unit, the only reason it had to exclude the Vincentian Fathers of the Eastern Province was the fact that they returned part of their money to the Order which in turn made a gift to the University.[4] In essence, the Board argues that the Eastern Province Vincentians by this procedure were, in effect, making a kickback of salary to their employer, Niagara. The Board again relies on *Seton Hill College, supra.*

In that case, the Order of the Sisters of Charity of Seton Hill was under a contractual obligation to return to the employer college "a substantial part of their nominal wages." 201 N.L.R.B. at 1027. There is not a scintilla of evidence in the entire record which would allow the drawing of any inference to support a finding that the Eastern Province Vincentians were under a similar contractual obligation to return parts of the salaries of their members who worked at Niagara to that school. The undisputed evidence only allows the conclusion that the money given to the University by the Province was a gift.

As we have indicated, the decision of the Board here is in conflict with its prior ruling in *D'Youville, supra,* where the nuns' gift of part of their salary to the employer was similar to the arrangement at Niagara. While the Board urges that the grouping of religious faculty with lay faculty for the purpose of collective bargaining at religiously-sponsored schools has evolved case-by-case and that the instant case is consistent with that evolution, we find its decision here so inconsistent with its prior decisions in this area and with the rationale of its clarification opinion in this case as to represent an arbitrary imposition of its authority.

The Board argues, as we have indicated, that the chief consideration in determining the bargaining unit is the "community of interests" shared by the employees. One of the important factors in finding this is employee remuneration. The Regional Director found that the religious and lay faculty at Niagara have a common wage scale[5] and working conditions. The University's probation, leave, promotion, and academic freedom policies apply to them equally. They come in daily contact with one another and there has been temporary interchange between them. He also found that both are eligible for participation in the employer's life insurance and retirement program. The differences that do exist such as the religious faculty not being tenured and not actually participating in the employer's retirement plan, were found by the Board in the unit clarification proceeding to be "hardly the whole or even an overwhelmingly large part of the employment situation, and they indicate little more than a diversity of immediate interests that would be found in any unit, such as one combining young and old employees." 227 N.L.R.B. No. 33 at 7.

Our review of the record compels the conclusion that the exclusion by the Board of religious faculty of the Congregation of the Mission, Eastern Province, from the bargaining unit was arbitrary and its reasoning unsupported by substantial evidence. The "community of interests" here between lay and religious full-time faculty has been well established. The fact that the lay faculty does not wish the religious to be in the group should hardly be sufficient reason to exclude them. Certainly in our view neither their vow of poverty nor the contribution they make to their Order and the disposition by the Order of that gift should be a sufficient cause to disregard the fact that their terms and conditions of employment are practically identical with that of

---

**4.** The Eastern Vincentian faculty did not receive their salary checks directly. These were assigned to the Province. It was customary for the Province to make donations to Niagara. However, it was under no obligation to do so.

**5.** This serves to distinguish our opinion in *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 879 n. 3 (2d Cir. 1977) where the religious

teachers in a high school were found to have a wage scale lower than that of the lay faculty. The fact that at Niagara the pay scale of both groups is the same would give some indication that the college faculty who are religious have an interest in maintaining parity with their lay colleagues.

the lay faculty. In addition, we note that the exclusion of the seventeen Eastern Province Vincentian priests from the unit deprives them of any meaningful opportunity to exercise their collective bargaining rights.

Therefore we grant Niagara's petition for review, set aside the Board's order and deny the cross-petition for enforcement.