MERCY HOSPITAL OF BUFFALO,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

Buffalo & Western New York Hospital
and Nursing Home Council,
Intervenor.

Nos. 121, 268, Dockets 81–4070, 81–4092.

United States Court of Appeals,
Second Circuit.

Argued Oct. 28, 1981.

Decided Jan. 7, 1982.

Paul B. Zuydhoek, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., for petitioner.

John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent.

Frank S. Kedzielawa, Buffalo, N.Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Stuart M. Pohl, Buffalo, N.Y., of counsel), for intervenor.

Before FEINBERG, Chief Judge, FRIENDLY and PIERCE, Circuit Judges.*

FEINBERG, Chief Judge:

Mercy Hospital of Buffalo (the Hospital) petitions this court to review and set aside an order of the National Labor Relations Board (the Board) dated March 19, 1981 that found that the Hospital had unlawfully refused to bargain with the Buffalo and Western New York Hospital and Nursing Home Council (the Union). The Board has filed a cross-application for enforcement of its order, which was entered upon the Gen-

---

* When this appeal was heard, Judge Pierce was a District Judge for the Southern District of New York, sitting by designation. He was in- ducted as a judge of this court on November 30, 1981.

eral Counsel's motion for summary judgment. We find that the grant of summary judgment was improper, and accordingly we remand for further proceedings.

## I

In November 1979, the Union filed a representation petition with the Board seeking certification as the exclusive collective bargaining representative of the Hospital's full- and part-time business office clerical employees. The parties agreed to a consent election, which was held in late December 1979. The election produced 33 votes for the Union, 32 votes against the Union, and a single challenged ballot cast by Sister Mary Blanche that obviously could have affected the outcome of the election. The basis of the Union's challenge to the ballot was that Sister Mary Blanche was a member of the Religious Sisters of Mercy (the Order), a religious order that allegedly controlled the Hospital. No party filed objections to the election.

After conducting an investigation of the challenged ballot, the Board's Regional Director issued a report on February 1, 1980, recommending that the Board sustain the challenge to the ballot, and that the Union be certified. The Hospital filed timely exceptions to the Director's report and recommendations. The Board rejected these exceptions and issued a Decision and Certification of Representative in July 1980 that adopted the Director's findings and recommendations and certified the Union.

Thereafter, the Union asked the Hospital to bargain with it, but the Hospital refused in order to obtain further review of the validity of the Union's certification. The Union filed a charge, and the Regional Director issued a complaint alleging that the Hospital's refusal to recognize the Union violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (5). The Hospital defended its refusal to bargain on the ground that the certification was invalid because the challenge to Sister Mary Blanche's ballot was improperly upheld. The Board's General Counsel filed a motion for summary judg-

ment, asserting that the Hospital's defense was merely an attempt to relitigate matters already resolved in the representation proceeding. In November 1980, the Board issued an order transferring the case to itself and giving the Hospital two weeks to respond to the General Counsel's motion. The Hospital responded by renewing its claim that the certification was invalid.

In March 1981, the Board issued its decision and order granting the General Counsel's motion for summary judgment. The Board concluded that the Hospital was attempting to relitigate issues already disposed of in the representation case. Accordingly, the Board found that the Hospital had violated sections 8(a)(1) and (5) of the Act by refusing to bargain with the Union. The Board required the Hospital to cease and desist from this unfair labor practice, to avoid infringing its employees' rights in any like or related manner, to bargain with the Union upon request, and to post appropriate notices. This petition for review and cross-application for enforcement followed.

## II

The source of controversy in this proceeding is the successful challenge to the ballot of Sister Mary Blanche. In its July 1980 decision certifying the Union, the Board had pointed out that:

[H]ere not only do the Employer's bylaws require that a majority of the board of trustees be members of the Religious Sisters of Mercy, but also the Hospital administrator is a member of both the Order and the board of trustees.

.     .     .     .     .

In view of the fact that the Order not only has majority control of the board of trustees, but further controls the day-to-day operation of the hospital, we find that the Order administers the Employer. We therefore further find that Sister Mary Blanche as a member of the Order is, in a sense, part of the Employer and that her relationship with the Employer is fundamentally different from that of

the employees in the bargaining unit. Accordingly, we adopt the Regional Director's recommendation that the challenge to her ballot be sustained. (Footnote omitted).

In this court, the Hospital attacks the Board's finding that the Order controls the Hospital and the Board's sustaining of the challenge to Sister Mary Blanche's ballot on the ground that she "is, in a sense, part of the Employer" and "her relationship with the Employer is fundamentally different from that of the employees in the bargaining unit."

The evidence before the Board was contained in affidavits, which showed the following: The Hospital is a New York corporation. It holds title to the land and buildings and is a legal entity distinct from the Order, which is the Hospital's sponsoring organization. Under the Hospital's bylaws, members of the Order must constitute a majority of the Hospital's board of trustees. That board currently has 17 members; nine are members of the Order and eight are lay persons. Twenty-three of the Hospital's 1,500 employees are members of the Order. Some members of the Order live in convents, one of which is located on the eighth floor of the Hospital. The Order pays rent to the Hospital for this space. It does not, however, donate money to the Hospital.

One member of the Order, Sister Sheila Marie Walsh, serves as the Hospital's Administrator. One of her two assistants is also a member of the Order. As Administrator, Sister Sheila Marie oversees the Hospital's daily operations. She has personally discharged one member of the Order for poor work performance. She was not required to contact the Superior General or any other member of the Order regarding this decision. Sister Sheila Marie is also a member of the Hospital's board of trustees and several professional organizations. She lives in the convent on the eighth floor of the Hospital.

The collective bargaining unit is composed of approximately 69 business office clerical employees. Sister Mary Blanche, who is a member of the Order, holds a part-time position as a billing clerk. Prior to her employment at the Hospital, she was a school teacher; the decision to leave that job was her own. Like other members of the Order employed at the Hospital, Sister Mary Blanche seemingly enjoys much the same terms and conditions of employment as lay employees. Religious employees, including Sister Mary Blanche, are apparently subject to the same probationary periods, disciplinary and termination procedures, and standards of performance as lay employees. Sister Mary Blanche receives a slightly higher wage, however, to reflect the fact that she is not covered by the Hospital's pension, disability, and social security plans but is subject to the Order's instead. Although there is a convent on the eighth floor of the Hospital, Sister Mary Blanche lives in a different convent. She can, however, eat in the sisters' dining room in the Hospital if she chooses. Sister Mary Blanche selected her current position herself after investigating the jobs available at the Hospital. She could choose to leave her job and return to her previous occupation if she so desired. Although the Superior General of the Order could theoretically command Sister Mary Blanche or any other member of the Order to do something, this possibility is remote and has not occurred in the last 20 years. Sister Mary Blanche's immediate supervisors are all lay persons. Sister Mary Blanche and Sister Sheila Marie have different religious superiors.

As a member of the Order, Sister Mary Blanche has taken vows of poverty, chastity and obedience. These vows are renewed on an annual basis. As a matter of personal choice and convenience, Sister Mary Blanche's earnings are sent to the residence of the Order's Superior General. A portion of her earnings are also forwarded to the superior of the convent in which Sister Mary Blanche lives to cover her room, board and living expenses. Her convent superior gives her some of this money to cover her personal expenses. The rest of her earnings support other members of the religious community. Sister Mary Blanche could go

to her convent superior for additional money to cover unusual expenses. Sister Mary Blanche is obligated to take a six-day retreat as a member of the Order. She takes this time as unpaid vacation. All part-time employees can take an unpaid vacation. On this record, the Board concluded that Sister Mary Blanche, as a member of the Order, was so closely related to her employer that she should be excluded from the collective bargaining unit.

### III

As this court noted in *Niagara University v. NLRB*, 558 F.2d 1116, 1118 (2d Cir. 1977), "the scope of review here is narrow. The determination of the appropriate bargaining unit involves an exercise of informed discretion by the Board and its decision will rarely be disturbed. However, as we have consistently held, where the Board's order is not supported by substantial evidence or is either arbitrary or unreasonable, this court will deny enforcement." (Citations omitted).

The Board decided this unfair labor practice dispute on a motion for summary judgment without holding an evidentiary hearing. In granting the motion, it simply relied on the record compiled by the Regional Director at the representation proceeding, which apparently consisted of four affidavits submitted by the Hospital. Whatever may be said in support of this practice in other situations, it led here to a record that was inappropriate for the grant of summary judgment. *NLRB v. Bristol Spring Manufacturing Co.*, 579 F.2d 704, 706–07 (2d Cir. 1978); *NLRB v. Mercy College*, 536 F.2d 544, 548–49 (2d Cir. 1976).

With respect to the Board's finding that the Order controlled the Hospital, the Board relied simply on two facts: members of the Order comprised a majority of the board of trustees and a trustee member of the Order was also the Hospital's chief administrator. But in analogous cases in which members of religious orders have been excluded from bargaining units, there has been a marked degree of financial control, found after an evidentiary hearing, by a religious order over an institution. In *Seton Hill College*, 201 N.L.R.B. 1026 (1973), for example, the religious order in question held legal title to the buildings and grounds of a college, and the college had a 99-year lease with rent set at one dollar per year. In a recent year before the representation hearing, the order had also made a substantial gift to the college. This evidence of financial control supplemented the findings that 50 per cent of the college's board of trustees and the college president were members of the order. In Saint Anthony Center, 220 N.L.R.B. 1009 (1975), a religious order owned and operated a nursing home and geriatric center that maintained centralized control of the operations of 13 other health-care facilities. Although a unit at only one of these (Saint Anthony Center) was considered appropriate, it is significant for our purposes that in all 14 the order had to approve major capital investments and real estate transactions, the assumption of significant contractual obligations, and changes in employees' fringe benefits. These findings reinforced the conclusion that management of the order and Saint Anthony Center were intertwined. In St. Rose de Lima Hospital, 233 N.L.R.B. 1511 (1976), the Board held that the record showed that the order owned and operated the hospital. Although the Board did not provide very elaborate evidence to support its conclusion, there was an evidentiary hearing and the hospital apparently did not object to exclusion of members of the order from the unit.

The Board points to the decisions in *D'Youville College*, 225 N.L.R.B. 792 (1976), and *Niagara University v. NLRB*, 558 F.2d at 1116, to support its position that majority membership on the board of trustees is enough to establish the Order's control of the day-to-day operation of the Hospital. In neither case, however, was there a simplistic reliance on the composition of the board of trustees as the sole criterion of control. In *D'Youville*, after a hearing, the Board found that the order had relinquished not only ownership but also responsibility for policymaking and administration

to the college's board of trustees. Although members of the order constituted only a minority of the board of trustees, this did not appear to be the principal ground of decision. Instead, the Board seemed most persuaded by the fact that the parties to the labor dispute had agreed that under the circumstances, religious faculty should be included in the bargaining unit. As the Board stated, "where as here no statutory or other overriding policy consideration exists precluding such inclusion, we can perceive no reason for not accepting the agreement of the parties...." Id. at 792.

More to the point is this court's decision in *Niagara*. In that case, there was no agreement by the parties that religious faculty should be included in the bargaining unit. This court held, however, that they should be included not simply because members of the order comprised no more than one-third of the board of trustees but also because the order did not hold title to the university's buildings and property. Under these circumstances, the order's annual voluntary gifts to the university were insufficient to establish control, and the board of trustees, not the order, operated the university.

As *Niagara* makes clear, reliance on any single factor to the exclusion of others to show control is unacceptable. As previously noted, the Order here neither holds title to the Hospital's property nor, apparently, makes substantial gifts. The only alleged indicia of control relied on by the Board are the Order's majority membership on the board of trustees and the top administrator's membership in the Order and on the board, both of which the Third Circuit apparently regarded as insufficient in an analogous context, cf. *NLRB v. Saint Francis College*, 562 F.2d 246, 250–51 (3d Cir. 1977). As against this, only 23 of the 1,500 Hospital employees are members of the Order, one of the the two assistant administrators is a lay person, Sister Mary Blanche is the only member of the Order in a unit of 69 employees, and her three immediate supervisors are all lay persons. Moreover, in contrast to earlier cases, the Board granted summary judgment here without ever holding an evidentiary hearing to permit more extensive factfinding. On this record, it simply cannot be said that on the question whether the Order controlled the Hospital there was no genuine issue as to any material fact.[1]

Accordingly, we believe that this case should be remanded to the Board for the receipt of additional evidence and for further findings of fact. Cf. *Linn Gear Co. v. NLRB*, 608 F.2d 791 (9th Cir. 1979). On remand, the Board should reexamine its findings that the Order controls the Hospital by considering further the nature of the powers and responsibilities of the board of trustees and the scope of authority wielded by Sister Sheila Marie and her assistants. For example, it would be relevant whether the trustees meet to consider business affairs of the Hospital; how often they meet; whether the members of the Order on the board of trustees have consistently voted as a majority bloc to promote the Order's interests, especially when important policy-making and administrative decisions were being made; and whether they receive instructions from the Order on how to vote. Any other evidence of significant financial control would also be quite important, of course.

### IV

In sustaining the challenge to Sister Mary Blanche's ballot on the ground that her interests diverged from those of lay

---

1. The Board contends that because the Hospital had not previously challenged the Board's finding that the Order controlled the Hospital, it was precluded from raising the claim in its petition for review before this court. We find this argument unpersuasive. As the Hospital pointed out in its reply brief to us, the Board itself acknowledged the Hospital's arguments on this issue when it stated in its Decision and Certification of Representative that "here not only do the Employer's bylaws require that a majority of the board of trustees be members of the [Order], but also the Hospital administrator is a member of both the Order and the board of trustees." Such a statement could only have been designed to rebut a claim that the Order did not in fact control the Hospital.

employees, the Board seemed to rely solely on her membership in the Order that allegedly controlled the Hospital. Indeed, the Board makes the point explicit in its brief to us, asserting that it can take administrative notice of the attributes of religious orders in determining whether Sister Mary Blanche was "in a sense, part of the Employer." According to the Board,

> It is sufficient that the Board can determine, first, that it is undesirable to include in bargaining units persons having substantial links to management, and, second, that members of religious orders have a close affinity to their orders. The first proposition is self-evidently one within the Board's competence to formulate, and the second is one which the Board could reasonably draw based upon the well-known nature and attributes of religious orders which, after all, are not new but have existed for thousands of years.

Under this view, the Board concluded that mere membership in an order that controlled the Hospital was enough to establish that Sister Mary Blanche did not share a community of interest with her fellow lay employees. Since we conclude that the record at this point does not justify the finding of control, the ruling regarding Sister Mary Blanche must obviously be reconsidered. However, even if the Board on sufficient evidence again concludes that the Order controls the Hospital, it does not necessarily follow that Sister Mary Blanche must be excluded from the unit.

The Board compared its approach on this issue to the one taken in cases involving blood relatives of management. In those cases, however, the courts have consistently abjured reliance on the blood relationship alone.[2] Instead, they have adopted guidelines to be utilized on a case-by-case basis. In *NLRB v. Caravelle Wood Products, Inc.*, 466 F.2d 675, 678 (7th Cir. 1972) (*Caravelle*

*I*), for example, the Seventh Circuit specifically stated that it "[would] not allow the Board to apply an automatic or per se rule to exclude spouses and children under section 9(b)...." It recognized, though, that "there are many precedents for the Board's exclusion on a case-by-case basis of relatives who enjoy a 'special status,' such as privileges or favorable working conditions not granted other employees." Id. The case was therefore remanded after provision of guidelines for a hearing on whether the family members could be excluded from the unit.

In *NLRB v. Caravelle Wood Products, Inc.*, 504 F.2d 1181, aff'd, 510 F.2d 257 (7th Cir. 1974) (*Caravelle II*), the Seventh Circuit upheld exclusion of the family members after the Board held a hearing in conformity with the guidelines and found that the relatives lacked a community of interest with their fellow employees. The court specifically held that the Board had not abused its discretion in applying a "community of interest," rather than a "special status," test because the Board had substantially followed the court's suggested guidelines. Id. at 1186–88.

In *Linn Gear Co. v. NLRB*, 608 F.2d at 791, the Ninth Circuit held that the Board could not exclude the son of an employer's majority stockholder and president from a collective bargaining unit on a motion for summary judgment. The Board had granted the motion despite what the court termed "a paucity of facts on the record," id. at 793. The court concluded that the grant of summary judgment without a formal hearing deprived it of the ability adequately to review the Board's determination. It therefore remanded the case to the Board for a hearing, citing the guidelines for the "community of interest" test developed in *Caravelle I and II*. The Fifth Circuit has also adopted this approach. *NLRB v. H.M. Patterson & Son*, 636 F.2d 1014 (5th

---

**2.** There is, of course, a narrow, statutorily imposed per se rule under section 2(3) of the Act, 29 U.S.C. § 152(3), which provides that "[t]he term 'employee' ... shall not include ... any individual employed by his parent or spouse...." The courts have refused automatically to exclude a principal shareholder's child or spouse under section 2(3), however. *Linn Gear Co. v. NLRB*, 608 F.2d at 795. Instead, they have decided these cases under section 9(b) of the Act, 29 U.S.C. § 159(b). Id. at 795–96.

Cir. 1981) (applying guidelines to uphold exclusion where full evidentiary hearing had been held by Board).

We therefore find no support in these cases for the Board's proposition that it may rely on administrative notice of the nature of religious orders to exclude Sister Mary Blanche without a formal evidentiary hearing. Nor can the Board exclude her merely because of her vows, *Niagara University v. NLRB*, 558 F.2d at 1120–21, as the Board itself recognizes. Yet, much of the behavior it relies on in excluding Sister Mary Blanche is a natural concomitant of taking such vows. Reliance on such behavior alone as the basis for exclusion would largely destroy our holding in *Niagara.* Our opinion there focused in particular on the comparative terms and conditions of employment for lay and religious employees. Id. at 1121; *accord, Nazareth Regional High School v. NLRB*, 549 F.2d 873, 879 n.3 (2d Cir. 1977) (exclusion of religious faculty members appropriate where they received significantly lower wages than lay faculty). Here, while some elaboration on the issue of wage differential seems appropriate on remand, Sister Mary Blanche's wages were apparently comparable to those of lay employees, although hers were slightly higher because she was covered not by the Hospital's pension, disability and social security plans, but by the Order's. It is true that this alone does not require her inclusion in the collective bargaining unit if, in other ways, her terms and conditions of employment differ significantly from those of other employees. For example, although Sister Sheila Marie's affidavit stated that all of the Hospital's part-time employees could take unpaid vacations, it was not clear in fact that any lay employees utilized this privilege on a regular basis as did Sister Mary Blanche or could consistently take such vacations with impunity. The degree to which lay employees were barred from areas to which Sister Mary Blanche had access, such as the nuns' living quarters and dining room in the Hospital, was also not plainly established. Differential access to a significant number of areas in the Hospital might constitute disparate terms of employ-

ment. It may also be the case that Sister Mary Blanche's position as a part-time employee is in other ways unique. It will be up to the parties on remand to flesh out the record in this regard.

We recognize the sensitive competing interests involved here. Not only are the rights of employees to bargain collectively at stake, see Lang, Toward a Right to Union Membership, 12 Harv.C.R.–C.L.L.Rev. 31 (1977), but protected First Amendment rights are also implicated, see Kryvoruka, The Church, the State and the National Labor Relations Act: Collective Bargaining in the Parochial Schools, 20 Wm. & Mary L.Rev. 33 (1978). By focusing primarily on the relevant terms and conditions of employment at a formal hearing, the Board should be able to strike an appropriate balance between these competing interests without infringing on cherished beliefs.

Accordingly, because the Board improperly granted summary judgment, we remand this case for further proceedings in accordance with this opinion.