730 F.2d 75
 115 L.R.R.M. (BNA) 3319, 100 Lab.Cas. P 10,869
 MERCY HOSPITAL OF BUFFALO, Petitioner-Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross-Petitioner,
and
Buffalo and Western New York Hospital and Nursing Home
Council, Intervenor.
 No. 496, Dockets 83-4136, 83-4154.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1983.
Decided March 7, 1984.
 
 Paul B. Zuydhoek, Buffalo, N.Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, John F. Donovan, Buffalo, N.Y., of counsel), for petitioner-cross-respondent.
 L. Pat Wynns, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent-cross-petitioner.
 Frank S. Kedzielawa, Buffalo, N.Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Richard Lipsitz, Stuart M. Pohl, Buffalo, N.Y., of counsel), for intervenor.
 Before FEINBERG, Chief Judge, and OAKES and PIERCE, Circuit Judges.
 PIERCE, Circuit Judge:
 
 
 1
 Mercy Hospital of Buffalo ("Hospital") brings this petition to review and set aside a Supplemental Order issued on June 3, 1983, by the National Labor Relations Board ("NLRB" or "Board"). The Board has cross-petitioned for enforcement of its March 19, 1981 and June 3, 1983 orders, finding the Hospital in violation of Secs. 8(a)(1) and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. Secs. 158(a)(1) and (5). Previously, the Hospital petitioned this court to review and set aside the March 19, 1981 order, which petition resulted in a reversal and remand for further proceedings. Mercy Hospital of Buffalo v. NLRB, 668 F.2d 661 (2d Cir.1982) ("Mercy I " ). For the reasons set forth below, the petition is denied and the Board's cross-petition for enforcement in full is granted.
 
 I. BACKGROUND
 
 2
 Additional details relevant to this case are set forth in our opinion in Mercy I, and familiarity therewith is assumed. We summarize here only those facts necessary for the disposition of the issues in the present action.
 
 
 3
 In November, 1979, Buffalo and Western New York Hospital and Nursing Home Council, AFL-CIO ("Union") filed a representation petition with the Board seeking certification as the exclusive bargaining representative of the Hospital's business office clerical employees. An election was held on December 27 and 28, 1979, resulting in a vote of 33 to 32 in favor of the Union, and a single challenged ballot. The challenged ballot was cast by Sister Mary Blanche, a member of the Sisters of Mercy of the Buffalo Diocese (the "Order"). The Union challenged the ballot because Sister Blanche was a member of the Order and the Order, it contended, controlled the Hospital.
 
 
 4
 The Board's Regional Director conducted an investigation and, on February 1, 1980, issued a report recommending that the Board sustain the challenge to the ballot and that the Union be certified. According to the Regional Director, the challenged voter belonged to the religious order that controlled the Hospital and was ineligible to vote because of her special relationship with the employer. Over the exception of the Hospital, the Board adopted the Director's findings and recommendations, and certified the Union.
 
 
 5
 Thereafter, when the Hospital refused to bargain with the Union, the Union filed a charge, and the Regional Director issued a complaint alleging that the Hospital's refusal to recognize the Union violated sections 8(a)(1) and (5) of the Act. The Hospital defended this charge by asserting that the certification was invalid because the challenge to Sister Mary Blanche's ballot was improperly upheld.
 
 
 6
 On March 19, 1981, the Board issued its decision and order upon the General Counsel's motion for summary judgment. The Board concluded that the Hospital had violated sections 8(a)(1) and (5) of the Act by refusing to bargain with the Union, and required the Hospital to, inter alia, cease and desist from this unfair labor practice.
 
 
 7
 The Hospital petitioned this court to review and set aside the order, and the NLRB filed a cross-application for enforcement. In an opinion filed on January 7, 1982, we concluded that summary judgment was inappropriate on the record presented, and that the Hospital was entitled to a hearing to determine whether the Order controls the Hospital and whether Sister Blanche, as a member of the Order, shares a sufficient community of interest with the employees in the bargaining unit so as to warrant her inclusion in the unit. Accordingly, the matter was remanded to the Board for further proceedings.
 
 
 8
 As a result of our decision in Mercy I, a formal hearing was conducted before an Administrative Law Judge ("ALJ") for nine days in August and September, 1982. The ALJ, on January 11, 1983, issued a decision finding that the Order did control the Hospital and that Sister Blanche did not share a community of interest with the other business office clerical workers. On June 3, 1983, the Board, in its supplemental decision and order, affirmed the ALJ's decision with minor corrections. This petition for review and cross-petition for enforcement followed.
 
 II. DISCUSSION
 
 9
 The question presented for our determination is whether the Board's unit determination, which excludes Sister Mary Blanche, is appropriate. If so, the Hospital's refusal to bargain with the Union is violative of sections 8(a)(5) and (1) of the Act. See Polymers, Inc. v. NLRB, 414 F.2d 999, 1001 (2d Cir.1969), cert. denied, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970). In support of its position that the unit determination is not appropriate, the Hospital contends that there is not substantial evidence to support the conclusions that the Order controls the Hospital and that Sister Blanche does not share a community of interest with the other unit employees. The Board, of course, disputes these contentions and argues that its unit determination is supported by substantial evidence.
 
 
 10
 As we noted in Mercy I, " 'the scope of review here is narrow.' " 668 F.2d at 664 (quoting Niagara University v. NLRB, 558 F.2d 1116, 1118 (2d Cir.1977)). The determination "of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, 'if not final, is rarely to be disturbed.' " South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (per curiam) (quoting Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947). The Board's determination will be set aside only if it is arbitrary or not supported by substantial evidence. Szabo Food Services, Inc. v. NLRB, 550 F.2d 705, 707 (2d Cir.1976); see Mercy I, 668 F.2d at 664; Niagara University, 558 F.2d at 1118. Based on our review of the evidence relied upon by the Board, we hold that the Board's conclusion that Sister Mary Blanche should be excluded from the bargaining unit is supported by substantial evidence.
 
 A. The "Control" Issue
 
 11
 As previously noted, in Mercy I we held that the Hospital was entitled to a hearing on the issue of whether the Order controlled the Hospital, cautioning the Board that "reliance on any single factor to the exclusion of others to show control is unacceptable." Mercy I, 668 F.2d at 665. We directed the Board to consider further "the nature of the powers and responsibilities of the board of [directors] and the scope of authority wielded by [the Hospital's Administrator] and her assistants." Id.
 
 
 12
 On remand, a formal hearing was conducted before an ALJ. The evidence adduced at the hearing relevant to the issue of control is as follows. The Order, incorporated under the laws of New York in 1901, is governed by a Superior General and a four-member General Council. One of the purposes for which the Order was formed is to engage in hospital work. In or about 1904, the Order founded Mercy Hospital of Buffalo, and it owned and operated the facility until 1957. In February of 1957, the Order incorporated the Hospital under the laws of New York. In March of that year, the Order conveyed all real and personal property used for conducting the Hospital's business to the newly formed Hospital corporation for the sum of $1 and the assumption by the Hospital of the then existing $818,500 mortgage debt. A motivating reason for setting up the separate Hospital corporation was to protect the Order from any liability that might arise from a successful malpractice action.
 
 
 13
 The Hospital's bylaws provide that the membership of the corporation shall consist of Sisters of Mercy who are on the board of directors of the Hospital corporation and members of the General Council of the Order; thus, lay persons cannot be members of the corporation. The Superior General and Vicar General of the Order are, respectively, the president and vice president of the corporation. The members of the corporation meet only on an annual basis. Pursuant to the bylaws, the membership of the corporation must authorize major corporate transactions.[1]
 
 
 14
 To the extent not limited by the bylaws, the board of directors of the Hospital corporation is charged with conducting the business and affairs of the Hospital. As mandated by the bylaws, members of the Order (hereinafter alternatively referred to as "sisters") constitute a majority of the board;[2] the Superior General of the Order is the president of the board; and the Hospital Coordinator of the Congregation of the Order is the vice president of the board of directors. Testimony was received at the hearing that at least since 1968, only members of the Order have served as officers on the board of directors. Several sisters serve automatically on the board by virtue of the position they occupy either in the Order or in the Hospital, and they remain on the board as long as they hold the designated position. All other board members, lay and religious, may serve up to three consecutive two-year terms.
 
 
 15
 The procedure for appointment to the board of directors is somewhat different for sisters (other than those serving by virtue of their position) than for lay members. Prospective lay members are interviewed and nominated by a nominating committee. The nominating committee is appointed by the president of the board, who is a member of the Order. At the time of the hearing before the ALJ, a majority of the nominating committee members were lay persons. Candidates nominated by the committee must be approved by a majority of the board of directors. Unlike lay members, sisters are not interviewed by the nominating committee; rather, they are recommended to the board by the president. The board of directors meets monthly, except in August, and the record indicates that generally board votes on business and other matters have been unanimous.
 
 
 16
 The General Council of the Order consists of the Superior General and her four-member council and exercises some control over the affairs of the Hospital. While the Order may acquire property, without permission from the Vatican it cannot enter into a contract for the purpose of acquiring or selling permanent property or incurring debts where the value exceeds the sum set by the National Conference of Bishops and approved by the Vatican. Thus, unless the General Council agrees to request such approval, the Hospital cannot borrow money in excess of the sum set by the Conference of Bishops.
 
 
 17
 The day-to-day affairs of the Hospital are under the direction of the Hospital's Administrator, who is selected by the board on the basis of the Superior General's recommendation. While there is no requirement that the Administrator be a sister, the position has always been filled by a member of the Order. The Administrator hires personnel at the administrative and department head levels, and approves the firing of nonprobationary employees at any level. She directly supervises two assistant administrators, the administrative assistant, and the director of fiscal services. At the time of the hearing, three of these four supervisory positions were filled by lay persons. Each of these four supervisors, in turn, oversees a specified number of department heads, who are responsible for the day-to-day activities of the individual departments. At the time of the hearing, the vast majority of department heads were lay persons.
 
 
 18
 In addition to controlling the day-to-day operations of the Hospital, the Administrator is also charged with a wide range of other duties, including responsibility for top level administration in all areas of the Hospital; approval of ordinary repairs, improvements, and replacement of equipment; planning the agenda for the board meetings; and researching the needs of the Hospital with respect to short and long-range planning.
 
 
 19
 On the record presented herein, we cannot say the NLRB's conclusion that the Order controls the Hospital is not supported by substantial evidence, or is arbitrary or unreasonable. The evidence demonstrates that the Order has not relinquished responsibility for policy making and administration of the Hospital. The membership of the corporation is composed exclusively of members of the Order and, pursuant to the bylaws, only the membership can approve, among other things, major capital expenditures and real estate transactions. A majority of the board of directors must be sisters and, at least since 1968, all officers of the board have always been members of the Order. The president of the corporation and the president of the board is the Superior General of the Order. The day-to-day affairs and the responsibility to assess the short and long-range needs of the Hospital are under the direction of the Administrator, who is selected by the board on the recommendation of the Superior General; the Administrator has always been a member of the Order. Cf. Niagara University, 558 F.2d 1116 (religious order found not to govern university where order comprised no more than one-third of board of trustees and order did not hold title to university's buildings and property); Saint Anthony Center, 220 N.L.R.B. 1009 (1975) (management of order and of health care facility intertwined where order, inter alia, had to approve major capital investment and real estate transactions, the assumption of significant contractual obligations, and changes in employees' fringe benefits); Seton Hill College, 201 N.L.R.B. 1026 (1973) (control found where religious order held legal title to buildings and grounds of college, order made substantial gift to college, and 50% of college's board of trustees and college president were members of order).
 
 B. Community of Interest
 
 20
 The bargaining unit in this case is comprised of approximately 69 full and regular part-time business office clerical employees at the Hospital.[3] Sister Mary Blanche holds a regular part-time position as a billing clerk.[4] During the December 1979 election, the Union challenged Sister Blanche's ballot on the ground that she was a member of the Order that allegedly controlled the Hospital. The Board sustained the challenge to Sister Blanche's ballot on the ground that her interests diverged from those of the lay employees. In Mercy I we noted that in sustaining the challenge "the Board seemed to rely solely on her membership in the Order." 668 F.2d at 666. The Board attempted to justify its approach on this issue by comparing it to the approach taken in cases involving blood relatives to management. However, after analyzing the blood relationship cases, we concluded that they did not support "the Board's proposition that it may rely on administrative notice of the nature of religious orders to exclude Sister Mary Blanche without a formal hearing." Id. at 667.
 
 
 21
 Accordingly, we instructed the Board that upon reconsideration even if it again concluded that the Order controlled the Hospital, it did not necessarily follow that Sister Blanche must be excluded from the bargaining unit. Id. at 666. We directed the Board to this court's decision in Niagara University, wherein we focused in particular on the comparative terms and conditions of employment for lay and religious employees. 558 F.2d at 1121. We noted that although Sister Blanche's wages were apparently comparable to those of lay employees, "this alone does not require her inclusion in the collective bargaining unit if, in other ways, her terms and conditions of employment differ significantly from those of other employees." 668 F.2d at 667.
 
 
 22
 On remand, after conducting an evidentiary hearing, the ALJ compared Sister Blanche's terms and conditions of employment with those of the other business office clerical employees. On the basis of this comparison, the ALJ concluded that Sister Blanche does not share a sufficient community of interest with the other unit employees. This conclusion was affirmed by the Board.
 
 
 23
 The evidence adduced at the hearing demonstrates the following facts relevant to the community of interest issue. Sister Blanche has worked as a regular part-time billing clerk in the business office of the Hospital since 1975. All unit employees in the business office punch a time clock except for Sister Blanche and a lay employee, Mary Moesch, who is permitted to fill out a time card because of a physical impairment. Since 1978, Sister Blanche has filled in her time card by hand, which is the method apparently utilized by supervisors and managers. Prior to 1978, Sister Blanche's time was not recorded.
 
 
 24
 Paid vacation time for full-time lay employees is based on the individual employee's years of service, and at the time of the election, ranged from ten to twenty days per year. In 1980, an additional five days were allotted to employees with more than twenty years of service. Full-time lay employees are also entitled to ten paid holidays a year. Regular part-time lay employees are given ten paid days off each year, including vacations and holidays. At the time of the election, all members of the Order employed at the Hospital received fifteen paid days of leave, regardless of length of service and whether they were full or part-time employees. The number of paid leave days for sisters was increased to twenty in 1981. In addition, Sister Blanche testified that she received paid holidays. Further, while only full time lay employees are entitled to paid sick and personal leave days, both part-time and full-time religious employees are paid for days out due to illness. As a result of the Hospital's policies for religious employees with respect to paid time off, Sister Blanche was afforded in excess of thirty paid days off in both 1979 and 1980--more than three times the paid time off afforded regular part-time lay employees.
 
 
 25
 Lay employees in the business office are paid by the hour and receive their checks bi-weekly. Sister Mary Blanche, on the other hand, is salaried and the Hospital divides her annual salary into twelve installments and forwards each installment to the Order monthly. Lay employees are required to "punch out" any time they leave the Hospital premises and, other than the time allotted for vacation, holidays, and sick or personal leave, they are not paid for the time they do not work. By contrast, as noted, Sister Blanche does not punch a time clock and was paid even on the occasions when she left the Hospital to attend funerals and to seek outside medical care. In addition, Sister Blanche received her regular salary although her morning attendance at Mass caused her to be at least five to ten minutes late three to four times a week during the months of July and August. Unlike Sister Blanche, lay employees receive three warnings for tardiness and then are docked if they are late again. One lay employee testified that she was docked in 1978 and 1979 for being "quite late a few times, about two or three minutes each day."
 
 
 26
 The Hospital pays 80% of the Blue Cross-Blue Shield health insurance premiums for full-time lay employees. Regular part-time and part-time lay employees may obtain coverage under the Hospital's group policy, but the Hospital pays no part of the premium costs. Unlike the lay employees, members of the Order employed at the Hospital, both part and full-time, are provided with health insurance through the Hospital's group policy which is paid entirely by the Hospital. Sisters who leave the Hospital may continue to participate in the Hospital's group policy if the Order pays the premiums. Testimony was received that while no sister has ever been refused such coverage after her employment terminated, there have been instances where lay employees have been refused permission to retain their group coverage upon leaving the Hospital.
 
 
 27
 The Hospital also provides free health care to sisters employed at the facility and their parents; thus, they are not billed for charges not covered by a health insurance policy. However, full-time unit employees are entitled to only a 25% discount on any such unpaid balance and regular part-time lay employees receive a 10% discount; the parents of lay employees, whether full or part-time, are not entitled to any discount.
 
 
 28
 The Hospital's employee handbook requires that lay employees in the business office serve a six-month probationary period at the inception of their employment, during which time they must work on holidays in order to be paid for those days. At the end of the probationary period they are evaluated and, if the probationary period was successful, they are given a raise and are entitled to such benefits as paid holidays and health insurance. From the record evidence, it appears that Sister Blanche did not serve the required probationary period. Indeed, Sister Blanche herself testified that she was uncertain whether she worked for a probationary period after she was hired. Further, the evidence demonstrates that (1) Sister Blanche was paid for all holidays during her first six months of employment even though it appears she did not work on any of them; (2) she was not evaluated after her first six months; and (3) she did not receive a raise until eleven months after she started working, at which time all members of the Order employed at the Hospital received a raise.
 
 
 29
 The eighth floor of the Hospital serves as a convent with living quarters and a private dining room for members of the Order. This area is not suitable for Hospital use, and the Order pays the Hospital a maintenance fee for the space. While most of the sisters who work at the Hospital live on the eighth floor, Sister Blanche does not; however, she does eat lunch in the sisters' dining room, which is not open to lay employees. Lay employees eat in the Hospital cafeteria which is also open to Hospital visitors. The record indicates that the furniture in the sisters' dining room is different from that in the Hospital cafeteria, and that occasionally the menu in the sisters' dining room differs from that in the Hospital cafeteria. Although sisters who eat in the private dining room are supposed to be charged a $50 maintenance fee by the Hospital, Sister Blanche was not charged for her lunchtime meals and did not pay any fee until October of 1981. Lay employees, on the other hand, paid for their lunches at all relevant times.
 
 
 30
 In addition to the differences set forth above, the record evinces other, less significant differences in the terms and conditions of employment between the sisters and the lay employees. Based on our review of the record presented herein, we conclude that there is substantial evidence to support the Board's finding that the terms and conditions of Sister Mary Blanche's employment differ significantly from those of the lay unit employees. Thus, we hold that the Board did not err in excluding Sister Blanche from the bargaining unit.
 
 III. CONCLUSION
 
 31
 For all the foregoing reasons, we deny the Hospital's petition to review and set aside the order, and we grant the Board's cross-petition for enforcement of its orders in full.
 
 
 
 [1]
 Pursuant to Article V, Section 3, and Article VI, Section 12 of the Hospital's bylaws, neither the board of directors nor any officers or employees of the Hospital may enter into any of the following transactions or engage in any of the following acts, without first obtaining authorization of the membership (which consists solely of sisters):
 (a) Any borrowing of money by the Corporation, except as may be incident to its normal day-to-day operations, and the creation of any indebtedness on the part of the Corporation.
 (b) Any sale, transfer, mortgage, execution or deed-of-trust, lease, or any other transaction of any kind or nature affecting the title of the Corporation in or to its real property or any purchase by or lease to the Corporation of real property.
 (c) Any major capital expenditures.
 (d) Any discontinuance of existing services, merger, or consolidation of the hospital.
 (e) Any activity by or on behalf of the Corporation not permitted to be taken or carried on by an original exemption under Section 501(c)(3) of the Internal Revenue Code and its Regulations as they now exist, or as they may hereafter be amended, or by any original contributions to which are deductible under Section 170(a)(2) of such code and regulations as they now exist, or as they may hereafter be amended.
 Prior to 1982, the membership had to approve any loan sought by the board of directors, except those needed for day-to-day expenses. However, at the February 1982 meeting, the membership voted to permit the board to borrow up to one million dollars without seeking approval from the membership.
 
 
 [2]
 Lay members have only served on the board since 1971. At the time of the hearing herein, the board consisted of nine sisters and eight lay members
 
 
 [3]
 Employees at the Hospital who work more than 975 hours but less than 1,950 hours per year are considered regular part-time employees. Employees who work fewer than 975 hours per year are considered part-time employees
 
 
 [4]
 Because Sister Blanche worked approximately 1,690 hours a year (32.5 hours per week), she is a regular part-time employee